Argued January 5, decided January 17, 1911.

## ULMEN *v.* TOWN OF MT. ANGEL.

[112 Pac. 529.]

MUNICIPAL CORPORATIONS—DISCHARGE OF SEWAGE—INJUNCTION—"SEWAGE."

1. A city constructed an underground tile drain that collected surface water and drainage from houses, which ran from the drain into an open ditch and thence into a gully near the corner of plaintiff's residence property, which was low ground. The water in plaintiff's well, which was within 16 feet of the gully, was affected by the condition of the water in the ditch. *Held,* that water is sewage, and the city may be enjoined from discharging it into the gully, although the water in plaintiff's well at its best is not good.

MUNICIPAL CORPORATIONS—DISCHARGE OF SEWAGE—PRESCRIPTIVE RIGHT.

2. The convenience of the public will not authorize a city to direct surface or other waters in a public sewer or drain and empty them upon the land of an individual to his injury. and the right to do so cannot be acquired by prescription.

From Marion: WILLIAM GALLOWAY, Judge.

This is a suit by Anna Ulmen against the Town of Mt. Angel, a municipal corporation, to enjoin the defendant from draining certain streets into a gully which extends along plaintiff's residence property. A decree was rendered by the trial court in favor of plaintiff and defendant appeals.                              AFFIRMED.

For appellant there was a brief with oral arguments by *Mr. John A. Carson* and *Mr. Thomas Brown.*

For respondent there was a brief over the name of *Messrs. Rauch & Seitz,* with an oral argument by *Mr. M. A. Seitz.*

Opinion by MR. CHIEF JUSTICE EAKIN.

1. It appears from the evidence that a gully, formed by surface water, extending westerly through the southern part of the town of Mt. Angel, drains that portion lying south and east of the corner of College and Main streets, together with other ground. It crosses Main Street about 1,000 feet southerly from said street corner, and passes westerly along the north line of plaintiff's lot, which is 100 feet wide, north and south, and 330 feet, east and west, on the west side of, and adjacent to, Main Street. The course of that street is N. 21° 54' E., and the Southern Pacific Railroad crosses it in a course a little west of north near the intersection of Church Street; Charles and College streets being next north of Church, extending east and west. In the summer of 1908 the defendant town constructed a tile drain, about 10 inches in diameter and four or five feet under the surface, commencing on the north side of Charles Street some distance east of Main Street, and extending westerly to Main, thence southerly on the east side of Main Street to a point within 60 feet of the gully, and thence by an open ditch to the gully near the northeast corner of plaintiff's property. The drainage on Charles Street into the tile extends from a point 700 feet east of Main Street, and the witness Zollner, when asked, "if that is all the water from any of the streets conducted into the tile," answered: "Most of the streets." Much of the business part of the town is situated on the east side of Main Street and extending east on Charles Street; there being as many as 14 or 15 business houses in that vicinity mentioned incidentally

in the evidence. There is also a creamery in that neigh-
borhood, which is drained into the tile on Main Street.
Plaintiff's property is low ground, described by some wit-
nesses as a swale, the well thereon being within 16 feet
of the gully or ditch on the north line, and the evidence
tends to show that the water in the well is, to some extent,
affected by the conditions of the water in the ditch; that,
when the water in the ditch is discolored, it is also dis-
colored in the well. One witness testifies that in the sum-
mer there is no water in the gully at all; that since this
tile drain was laid the surface water is dark, and does
not flow entirely through the ditch at first, but is absorbed
by the dry ground, some description being given of the
character of offal going into the drain, both from the
streets and buildings, also the creamery; that there is a
bad odor from the water in the gully, noticeable upon the
street, as well as at plaintiff's residence, and from the
water in the well. One of defendant's witnesses, when
asked by counsel if there were any impurities put into
the drain by authority of the town, says:

"Of course, when there is a heavy rain, the water is not
clean. Everybody knows that."

Another says:

"Several years back there was a closet run out in the
street. We made them change that. There was a smell
when walking along the sidewalk. We got them to make
a change."

It is very evident that in a town of that size there will
be a much greater quantity of water drained off the
streets and through the ground than is caused by rain
and snowfall, and that it carries with it a very different
quality of water. Every building must have a water sup-
ply, either from a well or by a method provided by the
city, the great bulk of which is used for cleansing pur-
poses. Much of it goes directly into the drain, which,

with the rainfall, carries all kinds of filth and impurities from the surface of the streets, as well as underground drainage, which is equally polluting, into the drain tile, and, when cast upon the surface of a dry gully or into a small or sluggish stream, necessarily creates a nuisance, and is a menace to the health, comfort, and convenience of those residing in its vicinity and of the public generally, and we think the findings of fact made by the trial court are fully sustained by the evidence: Gould, Waters, § 546.

Defendant's principal contention is that the drainage is not sewage, but ordinary surface drainage unaffected by the fact that it is from the streets of the town. It is immaterial by what name it is called. If the water is polluted by the filth from the buildings and streets, it may well be called "sewage." The Universal Dictionary says "sewage" includes the water by which the foul matter which passes through the drains, conduits, or sewers of a town, is carried off, the waste water of baths, washhouses, and other domestic operations, and of the greater part of the surface drainage of the area drained.

2. Joyce, Nuisance, at sections 284-286, discusses the rights and liabilities of municipal bodies in the deposit of sewage or any polluted drainage, and is to the effect that it cannot so deposit such pollutions as to create a public or private nuisance. The corporation is liable if, without authority of law, it collects surface or other waters in a public sewer or drain and empties them upon the land of an individual to his injury, either immediately or by the force of gravitation. Gould, Waters, § 262. At section 546 Mr. Gould says:

"If any nuisance of this kind be shown, though causing inconsiderable damage, equity will enjoin its continuance. * * The inconvenience is one of the public's own creation, and should be borne by it rather than the individual."

And the convenience of the public will not be considered. So also the right to maintain a nuisance cannot be acquired by prescription: *People* v. *Gold Run Ditch & Mining Co.*, 66 Cal. 138 (4 Pac. 1152: 56 Am. Rep. 80).

Some proof was offered tending to show that the water from plaintiff's well at its best is not good, but, if so, that fact would constitute no excuse for the town to discharge its drainage on her property and make it worse.

It is the duty of the town to dispose of its drainage in some manner that will not create a nuisance to individuals or the public, and the decree will be affirmed.

AFFIRMED.