Argued at Pendleton May 4; affirmed June 2; objection to cost bill
sustained July 7, 1943

# McGOWAN et al. v. CITY OF BURNS
## (137 P. (2d) 994, 139 P. (2d) 785)

Before Bailey, Chief Justice, and Belt, Rossman and Lusk, Associate Justices.

*C. B. McConnell,* of Burns, for appellants.

*R. E. Kriesien,* of Burns, for respondent.

ROSSMAN, J. This is an appeal by the plaintiffs from a decree of the circuit court which denied to them an injunction which they sought for the purpose of preventing the defendant municipality from removing from one of its streets two driveway structures built there by the plaintiffs.

September 24, 1941, the council of the defendant municipality adopted a resolution which declared that the plaintiffs' structures "and other approaches of similar design" were nuisances, and ordered their abatement. The adoption of the resolution precipitated the suit now before us.

The two driveway structures, which the witnesses termed aprons, were built by the plaintiff, Archie McGowan, in 1937, in Madison Street near its intersection with North Broadway street in the defendant municipality. McGowan owns the adjacent property and at that time was erecting upon it a gasoline filling station. The curbstone along Madison Street at the place in question is about six inches high. The purpose of the aprons was to afford access over the curbstone to the filling station. Instead of removing the curbstone and rebuilding the sidewalk so that it would slope down to the gutter of the street in the form of a ramp, he built up the part of the street adjacent to the gutter until it was flush with the curbstone. Thus, the latter virtually disappeared. The built-up section is the apron.

The aprons are made of concrete. One stretches 31 feet, 10 inches, along the curbstone, and the other, 25

feet. A space of 35 feet lies between the two. The longer of the two aprons extends from the curbstone four feet and six inches into the street. The 25-foot apron extends two feet and ten inches into the street. As already indicated, both aprons abut on the one side against the curbstone and at that point are of equal height with it, that is, six inches. As each apron extends from the curbstone into the street, its height gradually diminishes until at its outer extremity it merges directly with the pavement. Thus, it affords ready access to the filling station grounds.

Since the apron, made as it is of concrete, completely fills the gutter, it would prevent the flow of surface water in the gutter unless some provision were made for it. For that reason, a metal culvert was placed in the gutter before the cement was poured for the apron. The surface water flows through the culvert.

The plaintiffs' property is situated at the northeast corner of North Broadway and Madison Streets in the defendant municipality. It faces 100 feet on both streets. January 9, 1937, Mr. McGowan and two associates applied to the defendant for a permit to improve the property with a gasoline service station. The application read, in part: ''We are attaching hereto a copy of the proposed ground plan.'' The application and plan are before us as exhibits. The plan was prepared by a competent engineer and was drawn to scale. There is no indication whatever upon it for an apron approach. To the contrary, it indicates approaches to the station of the type that is known as a ramp. It shows two of these, one for the Broadway side and the other for the Madison Street side. As we have said, an apron approach retains the curbstone and passes the traffic over it. A ramp approach, to the contrary, eliminates the

curbstone. It begins at the level of the gutter, after the curb has been removed, and slopes its surfaces gradually upward until it meets the level of the sidewalk. In the present instance, since the sidewalk is immediately adjacent to the curbstone, the drawings which indicate the ramps called for the reconstruction of a part of the sidewalk on the Broadway side 44 feet long along the curb and 6 feet wide, and on the Madison Street side a section of the sidewalk 32 feet long and 6 feet wide. At both of those places the plans contemplated the removal of the curbstone and the substitution of the parts of the sidewalk above mentioned with new parts sloping upward from the level of the gutter to the level of the remaining sidewalk. The reconstructed area would, of course, be the ramp.

The application for the building permit was granted and the improvements were constructed in harmony with the plan, with the exception of the approach on the Madison Street side of the property. There, instead of building the single ramp (32 x 6) required by the plan, the two aprons which we have already described were built.

The two streets in question are 80 feet wide. The distance between curbstones on both streets is 56 feet. The sidewalk on North Broadway adjacent to this property is 12 feet wide. That street is the main thoroughfare of the city. The sidewalk on Madison Street adjacent to the plaintiffs' filling station is six feet wide and is laid next to the curbstone; thus, an area six feet wide is left between the inner side of the walk and the property line. Madison Street is of less importance than North Broadway.

When the station and aprons were built, Madison Street was not paved from curb to curb. Only an area

in the center, 24 feet wide, was paved, leaving a space on each side of the pavement 16 feet wide between the pavement and the curb. The entire width of the street was paved some time after the station was built.

When the station and aprons were built, one Mc-Kinley Lowe was the defendant's building inspector. The contractor who built the station was one Herman Thies. The latter, as a witness for the plaintiffs, testified that when he undertook to substitute the aprons on Madison Street for the ramp which was shown in the plans, Lowe objected. According to Thies, ''There was some argument about it all right, but I couldn't recollect all of it, but then they let us put it in as we wanted to.''

The evidence indicates that no accidents have occurred as a result of the aprons. Lowe, who, in addition to being the city's building inspector, is also its street superintendent, swore that the aprons are an ''inconvenience to snow removal'' and that each of them ''is a hazard to the motor traveling public as much as it is to pedestrians.'' According to his uncontradicted testimony, the drainage at North Broadway and Madison Streets is ''a poor drainage system at the best'' and his force is continuously compelled to clean out the trash which accumulates in the culverts preventing surface water from running through them. The appellants' (plaintiffs) brief says:

> ''It is evident from the testimony of the Street Superintendent that the City of Burns has a serious problem in handling its street surface drainage, and especially under the conditions as they exist on the south side of plaintiffs' property where the fall in the grade is but 7/10 of a foot in the 200 feet length of the block.''

The circuit judge before whom the cause was tried visited the place in question. From his carefully prepared memorandum decision, we quote:

"The use of the approaches under consideration is certainly not a public use, and I think that it cannot be said as a matter of fact that the approaches are not unreasonable obstructions to traffic. * * * I am of the opinion that these approaches are unreasonable obstructions both to public travel and to the proper drainage of the streets. * * * The ordinance which the City of Burns is attempting to enforce in this case tends to promote the public health, safety and welfare. These approaches may cause inconvenience or even danger to the public in the use of the street * * * and besides that they interfere seriously with the drainage of the street."

■ We believe that those conclusions are fully warranted by the evidence.

Mr. McGowan testified that to substitute a ramp approach for the aprons "would interfere with the efficient operation and economic operation of the entire station." He claimed that if ramps were substituted for the aprons they would have to extend a long distance into the station grounds in order to afford a sufficiently gentle slope; otherwise cars entering or leaving the station grounds, according to him, would scrape their bumpers upon the incline of the ramp. He said that had he known when he built the station that the city would insist upon a ramp "undoubtedly that building would not be sitting where it is, it would be sitting farther north from two to five feet." He claimed that in order to build a ramp with a sufficiently gentle slope the sidewalk would have to be lowered "12 inches or 14 or 10 inches." Evidently that estimate is exces-

sive. The curbstone is approximately six inches in height, and surely the sidewalk level would not have to be lowered to a point below the gutter level.

Evidently Mr. McGowan believes that the filling station is so situated upon the lot that a ramp could not be built on the Madison Street side of the property which would afford a proper approach to the station. The distance from the Madison Street curbstone to the nearest wall of the station is 25 feet. That, seemingly, ought to be enough space to provide a sufficiently gentle slope for a ramp. The height of the curb is only six inches and, hence, a ramp extending six feet back from the curb (as called for by the plans) would rise only one inch in every foot—four degrees, forty-six minutes. It will be recalled that the plans contemplated a ramp, not an apron, on that side of the property. And it will also be recalled that a ramp built in compliance with the plans is employed on the Broadway side of the property. Mr. McGowan described that approach as "very satisfactory." The space on the Broadway side is much less than that on the Madison Street side; in fact, the building on that side starts directly on the sidewalk line. The plan, including, of course, the ramp on the Madison Street side of the property, was prepared, as we have already said, by a competent engineer. Concerning the engineer's qualifications and experience, Mr. McGowan testified:

"I contacted the Standard Oil Company and made arrangements with them to furnish me with their technical engineer in the construction of service stations. So we secured the services of this engineer, he drew up the plans and certain specifications. * * * As I said, he was a technical engineer for the Standard Oil Company operating here in the Northwest in the construction of service stations."

Thus, the plan, contemplating as it did the use of a ramp on the Madison Street side, was prepared by a skilled engineer who had designed many similar improvements. We mention once more that the ramp on the Broadway side, which was built in harmony with the plans, is serving its purpose in a manner very satisfactory to the plaintiffs.

We are not convinced that a ramp, if substituted for the apron, would interfere with the proper operation of the station. To the contrary, we believe that a ramp on that side of the property would serve as satisfactorily as the one on the Broadway side of the property. By having bestowed so much attention to the question of convenience, we do not mean to imply that in this case it is of controlling importance.

Obviously, if the plaintiffs can lawfully keep these two aprons in the street, other property owners can build and maintain similar structures in order to afford access to their properties. Undoubtedly, an apron approach is a very convenient means of driving from the street over the sidewalk onto one's property. If all property owners availed themselves of the privilege which the plaintiffs have embraced, the gutters in our streets would be filled with aprons and virtually disappear; drainage of surface water from the center of the street into the gutters would no longer be possible and, seemingly, the flushing of streets as a means of cleaning them would have to be abandoned.

The action of the defendant's common council which brought on this suit was its adoption September 24, 1941, of a resolution which reads as follows:

"BE IT RESOLVED by the unanimous vote of the Common Council of the City of Burns that

"WHEREAS it has been called to the attention of said council in the fore part of the year 1941, that

an obstruction is existing on East Madison St. between Broadway and North Alder Ave., in the City of Burns, and other approaches of similar design, and

"WHEREAS in the opinion of the Common Council said obstructions constitute nuisances per se and are obstructions to public thoroughfares and are endangering travel upon said streets

"NOW, THEREFORE, BE IT RESOLVED by the Common Council of the City of Burns that all obstructions now existing on any street in the City of Burns of service approach driveways be summarily abated by the Street Superintendent immediately."

From the circumstances above reviewed we see that (1) the two aprons were built in violation of the building permit which was issued by the city; (2) the aprons are deemed by the defendant's street superintendent as menaces to the safety of pedestrians and motorists, and substantial evidence justifies his point of view; (3) the aprons interfere with the proper drainage of the street; (4) if other property owners built aprons similar to the plaintiffs' the surface of the streets would be flat and drainage waters would no longer flow into the gutters; (5) the common council of the defendant municipality deems the plaintiffs' aprons obstructions which are nuisances per se; and (6) since the aprons were built, the city has extended the pavement to the full width of the street.

The plaintiffs seem to agree that when a street is opened for the use of the public it should be kept free from obstructions placed there by individuals without public authority, and from the danger to travelers created by such obstructions. It seems evident that the plaintiffs' aprons are obstructions which interfere with the uses commonly made of a paved city street.

With the aprons in the gutter area, rain and melting snow, instead of running into the gutter, either stands where it accumulates or makes its way to the sidewalk. Since the culverts, which are a part of the aprons, are not of large diameter, trash accumulates in and about them and thus blocks the flow of water in the gutters. These are not the only ways in which the aprons interfere with the normal use rendered by a street. The street superintendent and the resolution adopted by the city's common council declare that the aprons endanger travel by pedestrians and motorists upon this street. The trial judge, after visiting the property, came to the same conclusion. We believe that the aprons endanger the safety of travelers upon the street and interfere with the latter's drainage.

■ The ancient definition of the term "nuisance" is: "That which worketh hurt." In the application of that definition, the decisions declare that any obstruction in a street, placed there without authority from the proper public body, constitutes a public nuisance; and especially do they agree that any fixed permanent object built into a public thoroughfare without proper authorization, and interfering with the function of the thoroughfare, is a public nuisance per se: *Lowell v. Pendleton Auto Co.*, 123 Or. 383, 261 P. 415; *Gaston, Town of v. Thompson*, 89 Or. 412, 174 P. 717; *Baines v. Marshfield & Sub. R. Co.*, 62 Or. 510, 124 P. 672; *Savage v. City of Salem*, 23 Or. 381, 31 P. 832, 24 L. R. A. 787, 37 Am. St. Rep. 688; *Milarkey v. Foster*, 6 Or. 378, 25 Am. Rep. 531; and 25 Am. Jur., Highways, p. 566, § 273.

The two aprons under consideration are fixed to the roadway, they are made of concrete, and the plaintiffs intend to keep them in the public street permanently.

█ Section 95-3003, O. C. L. A., says:

"Every act or thing done, or anything existing within the limits of any such city or town, which is or may be declared by any law of this state or by any ordinance of such city or town to be a nuisance, shall be and the same is hereby declared to be a nuisance, and shall be considered and treated as such in all actions, suits and proceedings whatsoever, unless such law or ordinance be declared void by a court of competent jurisdiction."

We believe that the resolution above quoted, which is in effect an ordinance (*Why v. City of Marshfield,* 138 Or. 167, 5 P. (2d) 696), is valid, and that the plaintiffs' structures are nuisances.

██ The plaintiffs argue, however, that since they are the owners of property abutting on Madison Street, they are entitled to make such reasonable use of the public way as will afford them convenient access to and egress from their property. The principles of law that underlie that contention received consideration from us in *Lowell v. Pendleton Auto Co.,* supra. It is manifest, however, that an abutting property owner, in the exercise of the rights just noted, must not render the street dangerous for travel. In *Higginbotham v. Kearse,* 111 W. Va. 264, 161 S. E. 37, 77 A. L. R. 1110, the court, in a carefully reasoned decision which reviewed the authorities exhaustively, held that a screen door, which formed a part of the entryway to a building and which swung out into the street, was a nuisance. The right of access to and egress from a public street is subject to the public's superior rights and to public regulation: *Jones Beach Boulevard Estate v. Moses,* 268 N. Y. 362, 197 N. E. 313, 100 A. L. R. 487 (annotated). After the plaintiffs, in violation of their permit, built these two

aprons, the defendants, according to the record, adopted the ramp as the permissible approach which an abutting property owner may build as an approach to his property. As we have seen, a ramp will afford satisfactory access to the plaintiffs' property.

We know of no reason for ignoring in this case the rule of universal application that the public, upon having improved a street in such a way that it is safe for travel, is entitled to have the thoroughfare remain in that condition, and that any object placed in the street without public authority is a nuisance if it obstructs the street or renders travel upon it dangerous. Whether such an object is merely a nuisance or should be branded as a nuisance per se is not a matter of consequence. The essential characteristic of a nuisance is that it imperils travel. We are satisfied that the two aprons maintained in Madison Street by the plaintiffs are nuisances.

The plaintiffs argue, however, that (a) since the defendant's officials did not prevent the plaintiffs from continuing the construction of the aprons after it had become evident that they intended to deviate from the building permit, and (b) since the aprons have remained in the street since 1937, the defendant is estopped from demanding the removal of the obstructions. There are several reasons why this contention can not be sustained. For instance, the plaintiffs knew when they expended their money in the construction of the aprons that they were doing so without right; the widening of the pavement has increased the mischief created by the aprons; and a nuisance, through its long continuance, gains no toleration in the law as far as the public is concerned. In our opinion, this contention is without merit. See *Lowell v. Pendleton Auto Co.*, supra; *Baines v. Marshfield & Sub. R. Co.*, supra;

and *Birmingham v. Hood-McPherson Realty Co.,* 233 Ala. 352, 172 So. 114, 108 A. L. R. 1140.

We have considered all of the contentions advanced by the plaintiffs and have examined with care the authorities which their counsel cites. We believe, however, that the decree of the circuit court must be affirmed. Such is the disposition which will be made of this cause.

Objection to cost bill sustained July 7, 1943

ON OBJECTION TO COST BILL

(139 P. (2d) 785)

ROSSMAN, J. This matter is before us upon objections made by the plaintiffs to the following items which are included in the bill of disbursements filed by the defendant:

Copy of the transcript of testimony ............$ 7.25
Amount paid for printing respondent's additional abstract of record ................... 38.00

The objection to the first item is well founded and must be sustained: Section 10-912, O. C. L. A.; and see *Campbell v. Corley,* 140 Or. 462, 3 P. (2d) 776, 13 P. (2d) 610, 14 P. (2d) 455.

The additional abstract of record consisted of a printed copy of the opinion rendered by the trial judge. As printed, the opinion is thirty-one pages long, exclusive of cover and flyleaves.

Section 216 of the Code of Civil Procedure, Laws of 1862, said:

"* * * The court may deliver any argument or reason in support of such decision, either oral, or in writing, separate from the decision, and file the same with the clerk."

That section of our laws, with the passage of time, became § 158, Ore. Laws. Chapter 211, page 396 of 1925

Session Laws, amended § 158, but retained the words just quoted. Chapter 165 of 1927 Session Laws amended § 158 (as amended by the 1925 Session) by adding to it additional provisions, but in so doing omitted the words just quoted.

Undoubtedly, the power to state the reasons which prompt a decision belongs inherently to every judge of a court. It is a component of the power to adjudicate. A statement of the reasons is frequently essential to the due administration of justice. The source of the power is not a statutory enactment, but the nature of the judicial office. The omission made in 1927 of the above-quoted words clearly did not deprive the judges of this state of their right to file in the records of the cause a memorandum decision, or state from the bench, while deciding the case, the reasons for the decision.

Rule 19 of the Canons of Judicial Ethics adopted by the Oregon State Bar says:

> "In disposing of controverted cases, a judge should indicate the reasons for his action in an opinion showing that he has not disregarded or overlooked serious arguments of counsel. He thus shows his full understanding of the case, avoids the suspicion of arbitrary conclusions, promotes confidence in his intellectual integrity and may contribute useful precedent to the growth of the law."

Rule 19 of the Canons of Judicial Ethics adopted by the American Bar Association in 1924 is to the same effect. See 62 Reports of American Bar Association, page 1124.

Several of the purposes served by a careful statement of the reasons which prompt the trial judge's

decision are stated in the above-quoted canon. We shall mention another. A carefully prepared decision which marshals the evidence applicable to the several issues, which states the trial judge's conception of the facts, which sets forth his understanding of the applicable legal principles, and which shows the manner in which he applied those principles to the issues, not only enables counsel to prepare their assignments of error with greater precision but also affords the appellate court judges an opportunity to perform their work of review with a knowledge of the reasons which brought the trial judge to his conclusion.

Judge Cardozo, in the introduction to his classic entitled The Nature of the Judicial Process, says:

"We reach the land of mystery when constitution and statute are silent, and the judge must look to the common law for the rule that fits the case. He is the 'living oracle of the law' in Blackstone's vivid phrase. Looking at Sir Oracle in action, viewing his work in the dry light of realism, how does he set about his task?

"The first thing he does is to compare the case before him with the precedents, whether stored in his mind or hidden in the books. I do not mean that precedents are ultimate sources of the law, supplying the sole equipment that is needed for the legal armory, the sole tools, to borrow Maitland's phrase, 'in the legal smithy.' Back of precedents are the basic juridical conceptions which are the postulates of judicial reasoning, and farther back are the habits of life, the institutions of society, in which those conceptions had their origin, and which, by the process of interaction, they have modified in turn. * * * But unless those conditions are present, the work of deciding cases in accordance with precedents that plainly fit them is a process similar in its nature to that of deciding cases in accordance with a statute. It is a process of

search, comparison and little more. Some judges seldom get beyond that process in any case. Their notion of their duty is to match the colors of the case at hand against the colors of many sample cases spread out upon their desk. The sample nearest in shade supplies the applicable rule."

Surely it is unnecessary to say more in order to indicate the value, in a reviewing court, of the reasons which prompted the trial judge to come to his conclusion.

Two decisions of this court passed upon the proper manner of bringing before this court the trial judge's opinion.

In *Thomsen v. Thomsen*, 118 Or. 614, 228 P. 832, 245 P. 502, 247 P. 808, this court denied a motion to attach to the transcript the trial judge's opinion. In so doing, the decision said:

"As such an opinion, it had no place in the files of record, although we might, upon a hearing, be disposed to consider it, as we would the opinion of any court upon questions of like characater."

In *Richards v. DeLin*, 135 Or. 8, 282 P. 119, 294 P. 600, (a suit in equity) the decision sustained a motion to strike from the files the respondent's additional abstract of record which contained only the opinion of the trial judge and the findings of fact and conclusions of law. We quote from the decision:

"The additional abstract of record in question contains nothing essential to an understanding of the questions presented on appeal. * * *. The written opinion of the lower court is often helpful. But it has no place in an abstract of record. It more properly belongs in a brief to be considered in the nature of an argument."

In the present instance, as we have indicated, the opinion of the trial judge was printed by the respondent under the title of Additional Abstract of Record. The respondent's brief quoted from it, as did also our opinion.

The two decisions from which we quoted indicate that the trial judge's opinion as printed should have been a part of the brief and not of the abstract of record; but that error alone cannot justify an order denying the respondent reimbursement for this item of expense; provided the charge made is no more than the amount respondent would have spent had it made the opinion a part of its brief. Without doing violence to substance, the opinion can be deemed a part of the respondent's brief. The printed pages, omitting cover and flyleaves, are thirty-one in number. Under Section 2, Rule 19, of this Court:

"The prevailing party is entitled to recover the actual cost of printing his * * * brief (not exceeding 40 copies) in the sum of not more than $1.25 a page, including cover."

Thirty-one pages at a cost of $1.25 per page totals $38.75. The actual charge entered in the bill of disbursements for this item is $38. Respondent's brief was twenty pages in length, and for it there is entered in the bill of disbursements a charge of $25; that is $1.25 for each of the twenty pages. Hence, it seems that the respondent has charged less for printing the memorandum decision as an additional abstract of record than it would have charged had it added it to its brief. The appellants, seemingly, have no occasion for complaint.

Although the practice of announcing the decisions in difficult cases through the medium of memorandum decisions is commendable, nevertheless, there

are appeals in which a copy of the trial judge's opinion is of no value. The rules of this court contemplate that nothing should be printed that will not facilitate a just determination of the controversy. Although a printed copy of the memorandum opinion, when it is applicable to the issues presented on appeal, is very valuable, it ought not be printed if it is inapplicable to the assignments of error. Likewise, if some parts of the memorandum opinion will be of no consequence to the issues presented to this court, those parts ought not be printed.

 We do not mean to imply that it is necessary that the memorandum opinion must be printed for it to gain the attention of this court. In the instant case the memorandum opinion was filed with the clerk of the circuit court, and in that manner came to this court. But the mere fact that the opinion was part of the transcript cannot deny the defendant the right to enter this item of expense in the cost bill; it is nothing unusual for a brief to contain parts of the typewritten record, or excerpts from the decisions of the courts. Whether a counsel will subject his client to the expense of printing parts of the typewritten record or quotations from the decisions found in the Reports is a matter for his determination. Disbursements made for unnecessary printing will not be allowed, but printing parts of the typewritten record or excerpts from decisions which are reasonably necessary in order to present a contention, are not deemed unnecessary. We cannot say that the printing of this memorandum decision was an item of expense for which a good reason could not be assigned.

The objections to the item of $38 are overruled; the one to the item of $7.25 is sustained.