Argued January 24, affirmed July 3, 1952

EAST ST. JOHNS SHINGLE CO. and GOTCHER *v.*
CITY OF PORTLAND

SCHMIDT *v.* CITY OF PORTLAND

Consolidated on Appeal

**246 P. 2d 554**

*James Arthur Powers,* of Portland, argued the cause and filed briefs for appellants.

*Marian C. Rushing,* Chief Deputy City Attorney, of Portland, argued the cause for respondent. With her on the brief was Alexander G. Brown, City Attorney, of Portland.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LUSK and WARNER, Justices.

WARNER, J.

This appeal is from a judgment in favor of the defendant city in two actions tried together before a jury. The complaints in both are identical in form. Each is an action for damages alleged to have been caused by the city of Portland in dumping raw sewage into the Columbia slough, a navigable body of fresh water situated in Multnomah county. It is about 18 miles in length, south of and adjacent to the Columbia river, and extends generally along the northerly boundary of the city outside the city limits. The flow from the city's sewers represents drainage from approximately 7,120 acres within its corporate limits situated on the northerly side of its peninsula district, with a natural slope toward the slough. During some seasons of high waters, the slough is augmented by a flow from the Columbia river at its east end. Except during such overflow periods, the slough contains stagnant water moved only by the ebb and flow of the tide in the Willamette river, into which it empties near its mouth.

East St. Johns Shingle Company, Inc., and Gertrude

Gotcher are plaintiffs in one case. Mrs. Gotcher is the owner of a parcel of land bordering on Columbia slough, upon which is situated the East St. Johns shingle mill operated by her husband and in which she has an apparent interest. Alfred Schmidt, doing business as Portland Shingle Company, plaintiff in the other case, owns another parcel similarly situated, upon which premises he operates a like industry. Along the slough are also many dwellings, businesses and other industries, including slaughterhouses and livestock-feeding places, which contribute to its pollution by the discharge of private sewers and drains.

For the purpose of this opinion, we will hereinafter refer to the complaining parties in both cases as the "plaintiffs".

Rafting in the slough was the method employed by the plaintiffs to get logs to their respective mills. One of the mills was solely dependent upon this waterway in order to get its log supply. It is plaintiffs' contention that the rafted logs became coated with sewage from the city sewers. They claim that this discharge of the sewer contents into the slough constituted a public nuisance from which they were damaged in a way different from the general public. This special damage, they assert, is reflected by the increased costs of their operations resulting from the contamination of their logs by sewage matter and necessitating cutting off and losing the value of the thus damaged parts. Plaintiffs also urge that the values of their respective properties were depreciated by the polluted conditions which prevailed in the slough. In each case damages are claimed for a six-year period immediately preceding the filing of their respective complaints. In the East St. Johns Shingle Company case this period would be from December 1, 1938, to December 1, 1944. In the

other case it would be from November 1, 1938, to November 1, 1944.

The city's defense rested upon allegations (1) that the city was not creating or maintaining a private nuisance in the Columbia slough nor causing damage to plaintiffs; (2) that plaintiffs' claim of permanent damage is barred by the statute of limitations; (3) that if any nuisance was created and damage done, it resulted not from action on the city's part but by activities of other persons and parties along the slough, primarily those of large packing plants which discharged the offal from their operations into its waters; (4) that the city had acquired a prescriptive right to use the slough as a place for emptying its sewage; and (5) that the plaintiffs are estopped from claiming damages, both by reason of their knowledge of conditions of which they complain and which the city says were existent when they acquired their respective properties and by further reason of their own acts contributing to the pollution of the slough waters.

Plaintiffs' first assignment of error has its genesis in the city's allegation of estoppel. It is predicated upon an instruction given and duly excepted to and also upon the court's refusal to give a requested instruction bearing on the same subject matter. The instruction to which objection was made reads:

"Now, this is on the question of estoppel,— when property owners are estopped from claiming any rights because they knew the conditions when they built their mills there, and so forth. The City further sets up claims in its answer that when plaintiffs bought their property and started their shingle mill that the City was already discharging sewage into the Columbia Slough, and that plaintiffs either knew or reasonably should have known of such discharge, and that therefore they have no

right to come in now and claim damages as a result of the sewage discharge. It is up to you as the jury to decide whether or not these statements are true, and if you find them to be the facts, that the effect of the sewage should reasonably have been foreseen, then plaintiffs are not entitled to recover any damages therefor.''

The essence of plaintiffs' objection to this instruction was that even if plaintiffs had discovered an obnoxious situation at the slough for which the city was responsible and even though it was existing at the time they acquired their properties, they were nevertheless not bound to anticipate that the city would commit and continue its acts of nuisance in the future to plaintiffs' special injury. Their requested instruction was of like tenor.

The city's defense of estoppel is an invocation of the ancient maxim of *volenti non fit injuria* (no legal wrong is done to him who consents). When applied in suits to abate nuisances or in actions to recover damages arising from their maintenance, it is more commonly known as the doctrine of ''coming to the nuisance,'' when relied upon by a defendant claiming priority of occupation and particularly when, during the period of such prior occupation, the nuisance complained of has been established. It savors of the rule of assumption of risk so well known in actions for negligence.

The early common law rule in regard to the location of a newly arrived inhabitant was that the latter must suffer the inconvenience to health and property from industries already located in the same vicinity. The reason for this law was that it was one's own fault to move into the proximity of the offending trade or industry. *Rex v. Cross,* 2 C & P 483, 172 Eng Rep 219

(Nisi Prius), is a very early English case, often cited by the authorities, where it was held:

> "If a certain noxious trade is already established in a place remote from habitations and public roads, and persons afterwards come and build houses within the reach of the noxious effects; or if a public road be made so near to it that the carrying on of the trade becomes a nuisance to the persons using the road; in those cases the party would be entitled to continue his trade, because his trade was legal before the erection of the houses in the one case, and the making of the road in the other."

The doctrine of "coming to the nuisance" is one of first impression in this jurisdiction. We have recognized its existence but have not applied it, nor have we indicated precisely what would be our reactions if invoked in a proper case. *Kramer v. Sweet,* 179 Or 324, 169 P2d 892, was a suit to enjoin, as a nuisance, the operation of a slaughterhouse in a residential district. At page 331 we said:

> " * * * The plaintiffs had established their residences in the locality for many years prior to the invasion thereof by defendant's slaughterhouse, and, under those circumstances, the court must take a less favorable view of defendant's case than it might have been disposed to take if his business had been maintained in the neighborhood for a long period of time. Conway v. Gampel, 235 Mich. 511, 209 N. W. 562."

In *Amphitheaters, Inc. v. Portland Meadows,* 184 Or 336, 362, 198 P2d 847, 5 ALR2d 690, we rested the matter with the observation: "Neither party can claim any greater social utility than the other. Both were in process of construction at the same time, and the case should not be decided upon the basis of the priority of occupation * * *."

The novelty of the doctrine to Oregon law is further

emphasized by the fact that each of the parties cites only one Oregon decision in support of its respective contentions concerning the doctrine's applicability or nonapplicability here. The plaintiffs rely upon *McGowan v. City of Burns,* 172 Or 63, 137 P2d 994, 139 P2d. 785; and the city relies upon *Miller v. City of Woodburn,* 134 Or 536, 294 P 349. In our opinion, neither is in point.

The McGowan case was one wherein the city of Burns sought to abate a nuisance in the street under the authority of an ordinance relating to "apron" approaches to filling stations. Such structures were held to constitute public nuisances and within the authority of the city to abate. The plaintiffs pleaded an estoppel on the ground that the city had previously approved and accepted the structure it was then seeking to destroy. This position was rejected by this court for the reasons stated at page 76:

"The plaintiffs argue, however, that (a) since the defendant's officials did not prevent the plaintiffs from continuing the construction of the aprons after it had become evident that they intended to deviate from the building permit, and (b) since the aprons have remained in the street since 1937, the defendant is estopped from demanding the removal of the obstructions. There are several reasons why this contention can not be sustained. For instance, the plaintiffs knew when they expended their money in the construction of the aprons that they were doing so without right; the widening of the pavement has increased the mischief created by the aprons; and a nuisance, through its long continuance, gains no toleration in the law so far as the public is concerned * * * ."

We also observe that an examination of plaintiffs' brief in the McGowan case indicates that plaintiffs did not

urge the rule which we are here considering, apparently well appreciating its inapplicability to the facts in that case. The failure of the court in the McGowan case to sustain an estoppel in that matter can be of no comfort to the plaintiffs here.

In the instant case the city says in its brief:

"We know of no Oregon cases involving the exact question here raised, except Miller v. City of Woodburn, 134 Or. 536, 294 P. 349, in which the court points out at pages 539 and 540:

" 'It is quite evident that the water in Ferrier Creek is unfit for human consumption and, no doubt, always has been since plaintiff acquired his property.' "

This gratuitous remark as to the long want of the potability of the waters of Ferrier creek loses much force and support in aid of the city's argument here, for we read elsewhere in the opinion that the property in controversy "has been owned by the plaintiff since 1874" and that the septic tanks of the city which were the source of the alleged nuisance were not constructed before 1910. No estoppel was there asserted on the ground that plaintiff had "come to the nuisance" nor could it have appropriately been done under the facts disclosed in that opinion.

The following Oregon cases have several elements in common with the matter at bar, as they are all cases wherein (1) the parties plaintiff were individuals seeking (2) relief against a city because of (3) the pollution or overflow of streams resulting from action on the part of the city: *Miller v. City of Woodburn,* supra, 134 Or 536; *Miller v. City of Woodburn,* 126 Or 621, 270 P 781; *Harbison et ux. v. City of Hillsboro,* 103 Or 257, 204 P 613; *Ulmen v. Town of Mt. Angel,* 57 Or 547, 112 P 529, 36 LRA NS 140. However, an examination

of the cases last cited indicates that all of the plaintiffs were in possession of their respective holdings prior to the inception of the nuisance which prompted their complaint and, therefore, there was no occasion to raise the estoppel asserted by the defendant city here.

Whether the rule of "coming to the nuisance" should or should not be applied here, or, if applied, if it should be done with exceptions and limitations, is therefore the problem we must now solve. In so doing, we will be governed as we were in *Amphitheaters, Inc. v. Portland Meadows,* supra, 184 Or 336, 361, and not decide the point "upon authority alone, divorced from reason or public policy * * * ."

The very novelty of the question projected by appellants' first assignment of error mandates careful consideration of all its many facets and diligent inquiry into a multitude of authority which bears upon it. This we have done with a consciousness of our duty not only to the appellants but also to all others who may in the future find themselves similarly situated. We shall not labor this opinion nor unduly extend it with a case-by-case analysis of the many cases cited in support of the doctrine relied upon by the plaintiffs and so admirably and completely collated by the citations found in support of the rule upon which they lean so heavily and as stated in the annotation in 167 ALR 1366 reading:

"It has been established virtually beyond question that if a condition, business, or occupation is so operated or maintained as to actually constitute a public nuisance or a private nuisance as *to those people living in the neighborhood,* the fact that the complainant or others purchased or occupied their property in the vicinity after the establishment of the condition constituting a nuisance will not constitute a defense or alone conclude an individual

complainant or public authorities in an action for relief.

"  *  *  *  *  *

"While there are a few cases which support a contrary view, it has been held or recognized in an overwhelming majority of cases that where property is so utilized as to constitute a public or private nuisance, the fact that an individual thereafter purchases or occupies property in an area affected by the nuisance will not defeat his right to its abatement or the recovery of damages due to its continuance, since the fact that the complainant 'came to a nuisance' does not constitute a defense or an estoppel, nor justify the continued operation of the nuisance." (Italics ours.)

We have critically examined not only each of the cases there cited but have extended our inquiry to include a great number of additional authorities suggested in part by the foregoing annotation and by plaintiffs' citation to 39 Am Jur, Nuisances, 472, § 197, reading in part:

"As a rule, it is no justification for maintaining a nuisance that the party complaining of it came voluntarily within its reach. Thus, according to the weight of authority, the fact that a person voluntarily comes to a nuisance by moving into the sphere of its injurious effect, or by purchasing adjoining property or erecting a residence or building in the vicinity after the nuisance is created, does not prevent him from recovering damages for injuries sustained therefrom, or deprive him of the right to enjoin its maintenance, especially where, by reason of changes in the structure or business complained of, the annoyance has since been increased  *  *  *  ."

In addition to the foregoing authorities, plaintiffs bring to our attention the following cases: *Mayor and Councilmen of Troy v. Coleman,* 58 Ala 570; *Town of Lumbber City v. Phillips,* 174 Ga 918, 164 SE 681;

*Town of Rentz v. Roach,* 154 Ga 491, 115 SE 94; *O'Brien v. City of St. Paul,* 18 Minn (Gil) 163; *Forbes v. City of Durant,* 209 Miss 246, 46 So2d 551. Those five cases have several elements in common. They are (1) predicated upon nuisances arising out of the overflow or pollution of streams (2) for which a municipality has some responsibility (3) to the inconvenience or damage of private householders (4) who had acquired their dwellings subsequent to the operation of the thing causing the nuisance complained of. *Anglim v. City of Brocktown,* 278 Mass 90, 179 NE 289, also cited by plaintiffs, has the same factors in common with the cases last referred to except that the nuisance therein resulted in the pollution of water in pondage areas on plaintiff's property despoiling it to such an extent that it could not be used for harvesting ice at a profit. *Fleming v. Hislop,* L R 11 App Cas 686—H L 696–697, likewise cited by plaintiffs, is an English case brought in behalf of the dwellers in a residential district to enjoin the burning of certain refuse resulting from a nearby mining operation. The Anglim and O'Brien cases are included in the annotation to 167 ALR 1364.

We have also examined many other citations in other texts in support of the general rule contended for by appellants. It is enough that we summarize generally the fruits of our quest for guidance on the question raised by the first assignment of error.

The preponderance of the cases upon which the text writers rest their assertion of the general rule may be characterized as falling within one or more of the following classifications:

(1) Cases which are actions by private parties against private parties and not municipalities or other governmental agencies.

(2) Cases wherein the plaintiff is the owner of a dwelling house and whose general family living is impaired by the presence of some industrial operation despoiling the air by noxious or noisome discharges from its plant to the discomfort or detriment of the health of the dwelling-house occupants. We here pause to observe that the very statement of the general rule relied upon by plaintiffs as found in 167 ALR 1366 is couched in terms of nuisances "to those people living in the neighborhood * * * ."

(3) Cases, a large majority of which is for the purpose of enjoining the continuance of the nuisance without the recovery of damages because of its maintenance.

None of the foregoing dominant characteristics are present in the case at bar. Here we have plaintiffs operating industries for profit suing not for an injunction against the city but for alleged damages to their manufacturing operations.

Not so long after the holding in the classic case of *Rex v. Cross,* supra, and beginning in 1838 with *Bliss v. Hall,* 4 Bing NC 183, 132 Eng Reprint 758, the English courts in a series of decisions gradually began to repudiate the stricture of that rule up to a point where it was said in *London, Brighton & South Coast R. Co. v. Truman,* L R 11 App Cas 45, 22 Eng Rul Cas 80— H L: " * * * the old notion of people losing their rights of complaint because they come to a nuisance has been long since exploded * * * ."

The American cases following the English rejection of the doctrine of *Rex v. Cross,* supra, when examined in terms of their historical setting, frequently reflect a conscious or unconscious adaptation of principle to the economic trend of the time, particularly the national

transition from the dominantly agricultural era to the one which followed and was characterized by the growth of industry and improved transportation with its concomitant expansion of villages into towns, towns into cities and cities into what we now call metropolitan areas, including as they do vast adjacent suburban acreages with a constantly increasing number of homes for those working in city centers and supporting manufactories. In the early period of this transition the courts favored the dwelling-house owner as against the operation of an industry which had previously established itself well beyond the boundaries of residential habitations. This thought is exemplified by the much-cited case of *Howard v. Lee,* 3 Sandford 281, decided in New York in 1849. There the plaintiff owner of a hotel sought to enjoin the operation of a soap factory and thereby avoid the offensive odors incident to its operation. The court in sustaining the injunction said, at page 283:

"The court can prohibit trades of this character from being carried on in a great city, or in a dense population, on the broad principle, that all trades which render the enjoyment of life and property uncomfortable, must recede with the advance of population, and be conducted in the outskirts of the city or in the country * * * ."

Among the earlier and frequently quoted cases repudiating the "coming to the nuisance" doctrine is *Wier's Appeal,* 74 Pa 230, 241, decided in 1873. Judge Sharswood in his famous opinion in that case said:

" * * * Carrying on an offensive trade for any number of years in a place remote from buildings and public roads, does not entitle the owner to continue it in the same place after houses have been built and roads laid out in the neighborhood, to the occupants of which and travellers upon which it is

a nuisance. As the city extends, such nuisances should be removed to the vacant grounds beyond the immediate neighborhood of the residences of the citizens. This, public policy, as well as the health and comfort of the population of the city, demand * * * ."

Some of the jurisdictions still refusing to recognize the doctrine of "coming to the nuisance" inflexibly continue to predicate their later holdings on the authority of the earlier cases which spring from a solicitude for the owners of homes in residential areas who suffered damage by nuisances incident to the operation of more or less isolated industries close to or within the boundaries of such residential areas.

On the other hand, other jurisdictions, while continuing to give proper regard to the superior claims of home dwellers against the assertion of industry to a preferential status arising from priority of ownership and operation, have nevertheless tempered their earlier holdings to give recognition to the claims of industrial operators who are a part of a long-established and recognized industrial center, wherein the area is dominated by manufacturing enterprises, and protects those there operating from claims for injunctive relief or damages upon the part of householders who have voluntarily and later established their habitations within the bounds of districts where trade and industry predominate. A striking illustration of this is found in the relatively recent Washington case (1942) of *Powell v. Superior Portland Cement,* 15 Wash2d 14, 129 P2d 536, to which we will later make further reference.

The later relaxation in favor of previously established industries in well established nonresidential districts marks a partial return to and application of the earlier common law rule announced in *Rex v. Cross,*

supra. Typical cases exemplifying this change in legal thought are *Ensign v. Walls,* 323 Mich 49, 34 NW2d 549, and *Schott v. Appleton Brewery Co.,* (Mo App), 205 SW2d 917.

Missouri is one of the states which in the annotation to 167 ALR 1368 is cited as a state supporting the rule contended for by the plaintiffs. *Beauchamp v. Taylor* (1908) 132 Mo App 92, 111 SW 609; *Hayden v. Tucker* (1866) 37 Mo 214. But in the more recent case of *Schott v. Appleton Brewery Co.,* supra, we find the Missouri Supreme Court saying, at page 920:

" * * * Throughout all of the authorities the underlying basic question to be determined is whether the use of the property is a *reasonable use.* What is a reasonable use and whether a particular use is a nuisance cannot be determined by any fixed general rules, but depends upon the facts of each particular case, such as location, character of the neighborhood, nature of the use, extent and frequency of the injury, the effect upon the enjoyment of life, health, and property, and the like. The use of property in one locality and under some circumstances may be lawful and reasonable, which under other circumstances would be unlawful, unreasonable, and a nuisance. 39 Am. Jur. pp. 298, 299, § 16. And while priority of location is not a defense as to one creating or maintaining a nuisance, it is one of the elements for the consideration of the trier of the facts, that this company was conducting an old and established business. Persons who live in cities or towns must necessarily submit, without legal recourse, to the annoyances and discomforts which are incidental to city (or town) life, and to the conduct of those trades and businesses which are properly located and carried on in the neighborhood where they reside, and are more or less necessary for trade and commerce and the comfort and progress of the public at large. 39 Am. Jur.

p. 326, § 44. These general principles of the law as applying to nuisances are too well settled to be questioned.''

Washington is among those states cited by 39 Am Jur, Nuisances, 472, § 197, and 167 ALR 1368 as a jurisdiction repudiating the doctrine of ''coming to the nuisance.'' *Bartel v. Ridgefield Lumber Co.,* 131 Wash 183, 229 P 306, 37 ALR 683, warrants that conclusion; but in 1942 the Bartel case was expressly overruled by *Powell v. Superior Portland Cement,* supra. In the Powell case the defendant cement company had long prior to 1934 operated a cement plant at the town of Concrete in that state. It was the dominant industrial operation in that community and the principal support to its economic existence and the source of livelihood of most if its inhabitants. Defendant's plant was permanent and represented a substantial investment. Notwithstanding the installation of dust-catching machinery, great quantities of fine limestone particles were carried into the home of plaintiff and other homes of the community causing substantial inconvenience and discomfort. Concerning this the court said, at page 538:

> '' * * * To require appellant to respond in damages for its continuance, is a step toward destruction of appellant's business. Respondent knew that living in the surroundings herein described necessarily entailed some discomfort. That burden he assumed when he acquired his property in a community the character of which had been established for many years.''

We are not unmindful that substantially all of the cases to which we have referred are cases wherein plaintiff householders sought to ameliorate conditions sustained by the operations of some privately owned enterprises. In the main, this springs from the fact

that plaintiffs' citations to 167 ALR 1364 and 39 Am Jur, Nuisances, 472, § 197, rest upon cases of that character. Indeed, as we have heretofore pointed out, the rule for which plaintiffs contend rests upon a proposition inspired by a judicial desire to protect the dwelling-house owner and his family. Such was its genesis, such has been its most notable application and such has been an element in its statement by some annotations (167 ALR 1364) and texts (Bispham, Principles of Equity (11th ed) 360, § 414, frequently referred to in annotated cases cited in support of the rule).

We also recognize that many of the cases from which we have hereinabove quoted and to which we hereinafter make reference are suits in equity, whereas this is an action at law. So, too, are many of the cases upon which plaintiffs' proposition rests. When, as here, we are considering a rule which has never been heretofore applied in our courts, we have no hesitancy in exploring decisions in equity as well as decisions in law, touching the same general subject, in order to find therein persuasive reasons for our own ultimate conclusions.

■ We are persuaded by the words of Chief Justice Rugg in *Stevens v. Rockport Granite Co.*, 216 Mass 486, 488, 104 NE 371, 373, Ann Cas 1915B, 1054, where he said:

> "The law of nuisance affords no rigid rule to be applied in all instances. It is elastic. It undertakes to require only that which is fair and reasonable under all the circumstances. In a commonwealth like this, which depends for its material prosperity so largely on the continued growth and enlargement of manufacturing of diverse varieties, 'extreme rights' cannot be enforced * * * ."

This very flexibility in the law of nuisance, as applied to the rule under consideration, finds recognition in an amplitude of authority not brought to our attention by the plaintiffs.

The protection which the law initially accorded to the homemakers who "came to the nuisance", as evidenced by the long line of cases of this character reiterating departure from the doctrine of *Rex v. Cross,* supra, has been tempered in many jurisdictions by giving units of industry in well-established industrial districts a preferential status over the claims of persons who subsequently move into or near such areas of trade and business. This is not only disclosed by some of the cases to which we have previously referred but by a statement found in 66 CJS, Nuisances, 746, § 8, reading: " * * * if a person moves into a town or neighborhood where by reason of the industries established certain annoyances prevail, he will not be permitted to complain of the continuance of such industries * * * ." This is in turn supported by citations to cases from ten different jurisdictions. This court has early indicated a predisposition to the rule laid down in 66 CJS, supra. In *Blagen v. Smith,* 34 Or 394, 406, 56 P 292, 44 LRA 522, it is said:

" * * * A court of equity will not interfere with the continuance of a lawful business in a locality where the buildings are mainly occupied for business purposes, because a few families may reside in the neighborhood: Gilbert v. Showerman, 23 Mich. 448; Doellner v. Tynan, 38 How. Prac. 176 * * * ."

In *Stoddard et al. v. Snodgrass et al.,* 117 Or 262, 270, 241 P 73, 43 ALR 1160, which was a suit to restrain the maintenance of an undertaking establishment near a residential area, the court gave due weight to its

previous existence in that area and the large sums that had been expended in the construction of the building. We submit that if a preferential status is to be accorded established industries with prior substantial investments, then reason dictates that a municipal operation for the general public welfare entailing great capital outlay merits not less but greater consideration.

■ There is authority in support of that proposition. The law recognizes that the nuisance claims of private owners must at times yield to public interest and convenience. Concerning this, we find in 39 Am Jur, Nuisances, 471, § 195, the following:

> "As a general proposition, nuisances cannot be justified on the ground of necessity, pecuniary interest, or convenience to the defendant. But at times, private interests must yield to the public good, and under the pressure of public necessity what would otherwise constitute a nuisance may be inflicted upon certain members of the community, subject to the limitation that if the creation or maintenance of the nuisance amounts to a taking of private property compensation therefor must be made. And when the public welfare requires it a nuisance may, for special purposes, be permitted. Public convenience or necessity may also be taken into consideration in some cases in determining whether or not to grant equitable relief."

Also see White, Negligence of Municipal Corporations, 140, § 112.

The right to relief against a municipal corporation for damages arising from pollution of water courses may be affected by various factors. As was said in 63 CJS, Municipal Corporations, 288, § 888:

> "Where the structure or work complained of was completed before plaintiff purchased the property claimed to be injured, and there has been no

change in the structure or increase of the injury caused thereby since his purchase, it has been held that plaintiff cannot recover  * * * ."

■ The immunity claimed by a latecomer to an area wherein a nuisance has long existed is lost when it is evident that he came with knowledge of the conditions which he later makes the basis for his complaint. This is disclosed by 39 Am Jur, Nuisances, 471, § 196:

"It is true, as a general proposition, that one who voluntarily places himself in a situation whereby he suffers an injury will not be heard to say that his damage is due to a nuisance maintained by another, a principle which is expressed by the maxim 'volenti non fit injuria.' The test of liability here, as in other situations, is the knowledge of the plaintiff respecting the consequences of his conduct. If it appears that he foresaw or might have foreseen the injury of which he complains, he will not be granted the relief which he prays  * * * ."

We recoil from the suggestion implied from the argument of plaintiffs. We do not think that a private party, particularly one operating a trade or industry for profit, should be permitted to set up its business in an area long characterized as industrial and where the nearby industries and the city have long used adjacent public waters for the disposal of sewage, offal and other wastage, and thereafter ask relief against a municipal corporation, if said party had previous knowledge of the over-all conditions then prevailing. It appears to us as against public policy to permit such a person to thereafter seek compensation from the public, when he could have reasonably foreseen the result of which he complains. A rule to the contrary would not only encourage litigation but would invite parties to speculate in property holdings in the vicinity of an existent public utility and later mulct a city in

terms of damages arising out of their own operations thereon. This would be especially true when such operations were of a kind peculiarly sensitive to injury from a known and previously established municipal activity.

The rule argued for by plaintiffs would unreasonably harass and possibly defeat a municipality in the performance of its usual and legitimate functions dedicated to the public welfare. Indeed, it might even bankrupt smaller cities of the state. It should be the policy of the law to at all times protect within reason the state's municipalities against such contingencies. Municipal enterprises of a governmental nature are ordinarily not operated for a profit and are not such as can be easily or economically uprooted, transported and re-established in new environs as may more frequently be done with a privately owned foundry, factory or chemical plant.

Regardless of how much one may be affected by the location of an indispensable governmental operation near his own property, such as a sewage disposal, it must not be overlooked that it is a necessity. It must be located near some property and be reasonably accessible to the community it serves to insure functional efficiency. Under such circumstances, the private convenience of one who has bought or built near a sewer outlet already established must yield to the convenience of the public.

In formulating a rule appropriate to the instant matter, we are impelled to be governed by the same reasons which motivated the Supreme Court of the state of Washington when it overruled its previous holdings on the doctrine of "coming to the nuisance" in the case of *Powell v. Superior Portland Cement,* supra, and where it said (129 P2d 538):

" * * * While due deference should be paid to precedent, the question in determining whether to accept or reject the precedent is how far it accords with good sense or reason; that is, the law should not be confined to precedents, but consists in the reason of them as 'The reason of the law is the soul of the law.' "

■ Predicated upon what we glean from the authorities to which we have hereinbefore alluded, we hold that a private party is estopped to sue a municipality for damages for a special injury arising out of a public nuisance having its origin in the operation of a recognized and duly authorized governmental function for the general public good, when the operation with its attendant nuisance existed prior to the party's acquisition of property in its vicinity and upon or to which property the alleged damage occurred, when the nuisance causing the injury was known or should have been known to such party at the time he acquired his holding, and provided further that the nuisance was not thereafter augmented beyond what might have been reasonably anticipated by the party at the time he made his acquisition.

■■ While we believe the foregoing rule is sound, salutory and consonant with public policy, we do not intend thereby to relax or deviate from the well-established principle that a municipality has no more right to create a public nuisance than has an individual, nor the equally well-established canon that a municipal corporation does not have the right to increase the natural flow of a stream or to pollute its waters to the material injury of a riparian owner. *Adams v. City of Toledo,* 163 Or 185, 192, 96 P2d 1078; *Wilson v. City of Portland,* 153 Or 679, 685, 58 P2d 257; *Miller v. City of Woodburn,* supra, 134 Or 536, 539; *Miller v. City of Woodburn,* supra, 126 Or 621, 625; *Harbison et ux. v.*

*City of Hillsboro,* supra, 103 Or 257, 267; *Ulmen v. Town of Mt. Angel,* supra, 57 Or 547, 550.

Our holding is, in essence, a limitation upon the right of certain persons to sue a municipality for damages arising out of a previously existing nuisance created by an authorized governmental function, when those persons are identified and circumscribed by the conditions before indicated. The rule which we lay down is not to be interpreted as a complete embracement of the "coming to the nuisance" doctrine as expounded by *Rex v. Cross,* supra, 2 C & P 483, 172 Eng Rep 219 (Nisi Prius). Whether the fullness of the rule of that case should be applied or withheld in other matters involving circumstances different from those found here, we leave to the future.

We now turn to a consideration of the undisputed evidence to ascertain if there are facts sufficient to warrant the estoppel contended for by the defendant city and the instruction given by the court on that point.

The record discloses that all of the city sewers emptying into the Columbia slough were installed prior to 1928. Any doubt concerning the city's right to have initially utilized the waters of the slough as an outlet for its sewers is set at rest by *Smith v. Silverton,* 71 Or 379, 381, 142 P 609 (decided in 1914), where we held that by legislative authority a city might with impunity run a sewer into *navigable or tidal streams,* if done in a proper manner. The waters of the Columbia slough are of that character. The statutes authorizing such action are §§ 95-1801 and 95-1805, OCLA.

Section 95-1801, OCLA, provides:

"Whenever any incorporated city or town in this state, acting by its council or other municipal authority, may deem it necessary or expedient to

construct a sewer partially within and partially without such city or town, or to construct a sewer outlet or perform or do any other work, acts or things without such city for the proper disposal of sewerage and drainage, it shall be competent and within the authority of such city or town, acting by its council or other municipal authority, to acquire by purchase, condemnation or otherwise, such property rights of way, easement and other rights without such city or town as may be needed or deemed essential for the construction of such sewer, sewer outlet, or other work or works, and provide for and do all things which may be necessary or deemed essential for the proper construction of such sewer, sewer outlet, and any and all other work or works, acts and things which may be deemed necessary or essential for the proper disposal of sewerage and drainage from such city or town and adjacent territory * * * .''

Section 95-1805, OCLA, reads:

''Such city or town, acting by its council or other municipal authority, shall have the right to divert waters and waterways, fill or drain lakes, ponds or other waters, increase or diminish the flow of waters in natural channels or dam channels and do and perform such other acts and things as may be found necessary or essential for the matters hereinbefore provided for, but no property rights or other vested rights shall be taken without agreement with the owner or a proceeding of condemnation.''

These sections were enacted in 1919 as a part of the same Act and after the holding in *Smith v. Silverton,* supra; therefore, any question raised in that case concerning legislative authority has been settled and determined by the Act of which they were a part.

■ The plaintiff Alfred Schmidt acquired the site for the Portland Shingle Company in 1936. The property

occupied by the plaintiff East St. Johns Shingle Company stands in the name of the plaintiff Gertrude Gotcher and was purchased by her in 1934, after the place had been located by her husband. Mrs. Gotcher had been actively engaged in the shingle business with her husband, Wesley W. Gotcher, since 1933, keeping the company's records and claiming to "know about shingles". The testimony of both Mr. and Mrs. Gotcher is so replete with the expression "we" in describing their various activities in connection with the shingle-manufacturing enterprise that it warrants a conclusion that they were co-owners and jointly and mutually interested in each activity undertaken and each major decision made relating to the mill's location and operation. In 1933 the East St. Johns Shingle Company was located on a barge moored on the Willamette river at the foot of Carolina street in the city of Portland.

Mr. Gotcher testified that he had started making shingles along the slough in 1930 in the Mongrain mill. In 1934 the East St. Johns operation was towed from the foot of Carolina street to a point on the slough west of Denver avenue. For several months prior to the acquisition of the site on the slough bank across from where they were then working, they anchored and operated their barge-mill. During a part of that time the plaintiff Schmidt was an employee of the plaintiff East St. Johns Shingle Company working on the barge. A fellow worker during that period testified that the waters of the slough were so bad that when he got through work, he looked like he had "come up out of a sewer."

Long prior to 1934, the area in which the plaintiffs' properties were located had been used by slaughter-houses, hog-feeding farms and other types of industries which had employed the slough as a place of dis-

posal for their offal and debris. Some of these plants had been there before 1914 and many before 1920. One of the exhibits was an industrial location map made by the State Sanitary Authority. This reveals the presence of more than 30 substantial industries serviced in this manner by the waters of the slough, all of which were there in 1942 and many long before that date. We think it appropriate here to observe that notwithstanding the conditions of which plaintiffs complain and which, according to Mr. Gotcher, were continually worsening, the Gotchers purchased two additional shingle mills situated on the waters of Columbia slough, the Altas mill in 1947 and one ironically called the Faultless mill in 1948.

■■ We take notice that the city of Portland is one of the great inland ports of the world and so geographically and strategically located with reference to the economic development and natural resources of the state of Oregon and the northwest that its continued expansion in population might well have been foreseen in 1934. We also take notice that the general area in which the enterprises of the plaintiffs were located has been consistently attractive to industry, including other mills engaged in the manufacture of shingles and lumber. On the industrial side, the site is one of growing size and importance. The city's sewers which empty into the Columbia slough are drainage for over 7,120 acres, all in the corporate limits and with housing for a great segment of the city's growing population. The conclusion is unavoidable that one could and should anticipate with reason that the amount of drainage from the city's sewers would not remain static after 1934 but would increase from time to time in more or less direct proportion to the population increase within the area served by the sewers, with

further augmentation by the incoming of new industries and the expansion of older ones in that part of Portland.

■ The plaintiffs are successful and experienced in the shingle business. Mr. Gotcher had been in that business and worked at his trade on the waters of the slough as far back as 1930. Even before he established his barge-mill there in 1934, he had been operating a shingle mill in the peninsula district of which the slough constitutes a boundary. Schmidt was a man of university education with a degree in business administration and worked for the Gotchers on the slough in 1934, preliminary to making his own investment in the Portland Shingle Company in 1936. These facts dictate the conclusion that when they purchased their respective properties along the slough, they knew the conditions present and foresaw or should have foreseen the conditions of which they now complain; and if the nuisance was thereafter augmented, it was not beyond what either of the parties might have then reasonably anticipated. The uncontradicted facts disclose that the plaintiffs, by reason of their own knowledge of the conditions of which they complain, purchased their properties *cum onere*.

■ We find that there is no merit in plaintiffs' first assignment of error. Our conclusions make it unnecessary to examine the other assignments of error. The judgment will be affirmed.