Argued October 21, affirmed December 9, 1974

STATE EX REL DEPARTMENT OF
ENVIRONMENTAL QUALITY, *Appellant, v.*
CHEMICAL WASTE STORAGE AND
DISPOSITION, INC. (No. 32-990), *Respondent.*

528 P2d 1076

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*Paul M. Reeder,* Hillsboro, argued the cause for respondent. With him on the brief were Reeder & Rapp, Hillsboro.

Before SCHWAB, Chief Judge, and LANGTRY and THORNTON, Judges.

LANGTRY, J.

Acting by and through the Department of Environmental Quality (DEQ), the State of Oregon initiated this injunctive proceeding seeking to compel compliance by defendant corporation with the provisions of the Environmentally Hazardous Wastes Statutes (ORS 459.410 through 459.690), and to have the "disposal site" owned by the defendant declared a public nuisance. The circuit court ruled in its decree:

"1.   That the Defendant cease and desist from adding any further waste to its disposal site at Alkali Lake,

"2. That Plaintiff's request that defendant be required to apply for a license to operate a waste disposal site is denied,

"3. That Plaintiff's request that Defendant be required to abate the public nuisance located on its property located at Alkali Lake is denied."

The state has appealed from the parts of this decree unfavorable to it, namely, Paragraphs (2) and (3).

Evidence, elicited at the hearing below, shows that in 1969 defendant purchased approximately 6,000 acres of the Alkali Lake bed located in southeastern Oregon after its president completed some three years of study concerning a "safe" disposition of pesticide wastes. Preliminary research had indicated that these waste materials could be successfully biodegraded into the soil, and that the most preferable site for such an operation would be one situated in a remote area where the soil was alkaline and where spillage would not contaminate a watershed. Having acquired the Alkali property which met essentially all of these requirements, Chemical Waste began early in 1969—pursuant to a contract with Rhodia, Inc., of Portland—to transport residue materials to that tract. These materials were contained in 55-gallon steel drums which were themselves stored within a ten-acre plot of the Alkali property.

In conjunction with representatives of Oregon State University defendant then secured a federal grant of money to continue with further research relating to the degradation of the wastes.

Throughout this organizational period defendant cooperated with Oregon's Department of Agriculture

in obtaining all permits or licenses required to maintain a disposal site as planned.

In 1971 the legislature passed and the Governor signed Oregon Laws 1971, ch 699 (ORS 459.410 through 459.690) creating the Department of Environmental Quality which was to assume jurisdiction over the control of "environmentally hazardous wastes," the proposed definition of which encompassed those materials present at Alkali Lake. After considering the impact of this new law, the directors of Chemical Waste decided that its anticipated operations were no longer feasible and determined that the biodegrading of the materials acquired pursuant to its contract with Rhodia would have to be completed before the terms of that law became applicable. Steps were then taken to that end, including the fencing of a 400-acre area to be used for the biodegrading and the installation of vats, mixing machinery and electricity.

Although the specific terms of the Act indicated that any preexisting disposal site could be maintained without a license from the DEQ until 60 days after rules and regulations governing the form and contents of license applications were adopted,[1] Chemical Waste was notified by the DEQ in December of 1971—some three months before any such regulations were, in fact, formulated—that no additional waste materials could be brought onto the Alkali site and that further dis-

---

[1] "ORS 459.510 does not apply to any person operating a disposal site on June 30, 1971, under a permit or license issued by any agency of this state until a license application therefor has been acted upon by the commission pursuant to ORS 459.410 to 459.690. If the operator of such a disposal site desires to continue to operate the disposal site, he must apply for a license under ORS 459.410 to 459.690, within 60 days after the commission has adopted rules governing the form and contents of applications." ORS 459.520 (1).

posal of materials already present was prohibited. As a result of this action, defendant terminated its operations, paid all creditors, and transferred the assets of the corporation—with the exception of the ten acres upon which the barrels containing the waste materials were stored—to the stockholders in exchange for their stock. At the time this suit was initiated by the state, therefore, Chemical Waste was a corporate "shell," with the ten-acre parcel constituting its sole asset.

After considering these facts, the circuit court concluded that it could not "decree the impossible," noting that

"* * * a $5,000 license fee, together with a cash bond of undetermined amount satisfactory to plaintiff, should now in some manner be raised and spent by defendant which is now a defunct corporation and whose untimely demise and the reason therefor has been above mentioned [referring to the DEQ's action in December which foreclosed any continued operations at Alkali Lake].

"In effect, the State torpedoed and sank the vessel which it now contends should complete the voyage and deliver the cargo * * *.

"* * * * *.

"The condition existing at the site does constitute a nuisance, but a nuisance that was allowed to grow with the permission and help of the State. It is true that estoppel does not lie as against the State, but certainly the State will not be allowed to complain in a court of equity where the condition of which it now complains was aided and abetted by the State itself and it would now, after disabling the defendant, ask this Court to require the defendant to abate the nuisance."

The decree quoted above was then entered.

We are directed by ORS 19.125 (3) to try "anew upon the record" this suit and to make our own independent study of the record and to arrive at our own conclusions. Consideration of the evidence disclosed by this record as well as issues involved leads us to the conclusions that (1) contrary to the finding of the lower court the storage of the waste materials on the defendant's Alkali Lake property does not constitute a public nuisance, and (2) because those waste materials fall within the statutory definition of "environmentally hazardous" materials (ORS 459.410 (6)), the defendant is currently operating a "disposal site," the maintenance of which is subjected to statutory provisions with which both the defendant and the state must comply.

> "The term 'nuisance' is incapable of an exact and exhaustive definition which will fit all cases, because the controlling facts are seldom alike, and because of the wide range of subject matter embraced under the term. There is no exact rule or formula by which the existence of a nuisance may be determined, but each case must stand on its own facts and special circumstances." (Footnotes omitted.) 58 Am Jur 2d 553-54, Nuisances § 1.

Acknowledging their essentially amorphous character, the Supreme Court of Oregon has declined to "define" the elements of either private—affecting an individual or limited number of individuals—or public —those prejudicial to the health, comfort or safety of citizens at large—nuisances. In *E. St. Johns Shingle Co. et al. v. Portland,* 195 Or 505, 246 P2d 554 (1952), the court found this analysis to be persuasive:

> " 'The law of nuisance affords no rigid rule to be applied in all instances. It is elastic. It undertakes to require only that which is fair and reasonable under all the circumstances * * *.' " 195

Or at 522, quoting *Stevens v. Rockport Granite Co.,* 216 Mass 486, 488, 104 NE 371, 1915B Ann Cas 1054 (1914),

and quoted with approval from *Schott v. Appleton Brewery Co.,* 205 SW2d 917, 920 (Mo App 1947):

" '* * * What is a reasonable use and whether a particular use is a nuisance * * * depends upon the facts of each particular case, such as location, character of the neighborhood, nature of the use, extent and frequency of the injury, the effect upon the enjoyment of life, health, and property, and the like. The use of property in one locality and under some circumstances may be lawful and reasonable, which under other circumstances would be unlawful, unreasonable, and a nuisance. 39 Am. Jur. pp. 298, 299, § 16 * * *.' " 195 Or at 520.

In *Atkinson et al v. Bernard, Inc.,* 223 Or 624, 355 P2d 229 (1960), the court held:

"* * * Each case then must be decided on its own peculiar facts, balancing the interests before the court.

"* * * * * *

"* * * The flexibility of nuisance law enables the trial judge to take into consideration * * * all relevant factors which will assist him in balancing the interests of the parties before the court in light of relevant public interest." 223 Or at 631, 633.

Here, the "nuisance" complained of conceivably falls into only that category of nuisance defined in *Amphitheaters, Inc. v. Portland Meadows,* 184 Or 336, 345, 198 P2d 847, 5 ALR2d 690 (1948), as "* * * [c]ases involving harm to human comfort, safety or health by reason of the maintenance by a defendant upon his land of noxious or dangerous instrumentalities * * *." Although the court below gave no indication of the grounds upon which its conclusion that

"[t]he condition existing at the site does constitute a nuisance * * *" was based, it is evident that the decision was necessarily founded on the determination that the site is harmful to "human comfort, safety, or health."

■ While, as we note below, defendant has been "operating" the site in violation of the Environmentally Hazardous Wastes Statutes from the time they became effective in early 1972, that continuing violation does not require a finding that the site constitutes a public nuisance. We find nothing in ORS 459.410 through 459.690 declaring such a site to be a nuisance per se. These statutes do direct tight control of the operation or maintenance of such sites and provide sanctions to be imposed where compliance is lacking; they do not, however, serve to make that a nuisance which is not so in fact.

The cases from which we have quoted lead to the conclusion that the peculiar locations and surroundings involved in the cases are of great significance and may in many cases be determinative of whether any nuisances exist. While reversing a conviction under the now abandoned "nuisance statute" (formerly ORS 161.310), the court in *State v. Anderson,* 242 Or 457, 461-62, 410 P2d 230 (1966), noted:

> "* * * The transportation of explosives on the public highways is not per se a public nuisance, though it may be such in particular circumstances * * *: 'The manufacture, keeping or storing of explosives is not *per se* a public nuisance. * * * .Whether or not such acts do constitute a nuisance depends upon the surrounding circumstances such as locality, quantity or manner of manufacture or storage.' * * *"

In *York et ux v. Stallings et al*, 217 Or 13, 20-21, 341 P2d 529 (1959), the court concluded:

"It is well settled that a sawmill is not a nuisance per se. * * * It is clear, however, that a sawmill may become a nuisance by reason of the character of the neighborhood in which it is situated or the manner in which it is operated * * *. "* * * * *.

"One factor commonly considered in determining the existence of a nuisance is the character of the area in question * * *."

It is undisputed that the ten-acre storage site involved here is located amidst the high desert of eastern Oregon, some three miles from the nearest "residence or farm or anything," and some two to three miles from the nearest public road.

■ The state alleges, however, that in spite of the site's remote location it should be condemned as a nuisance to the public on the ground that there are presently dangers of harm which may result from (1) human or animal contact with the waste materials, (2) contamination of water in the Alkali Lake Basin, and (3) an interference with the public comfort caused by odors emitting from the site.

In light of the fact that the entire ten-acre site is surrounded by a trench and enclosed by a woven-wire, "stock-tight" fence topped with three lines of barbed wire, kept locked at all times, the first, and probably the second, of the "dangers" alluded to by the state do not appear to be substantial. With reference to the second, much testimony was introduced below relative to the effect of heavy rainfall upon the disposal site where many of the steel drums have deteriorated to the point of being less than water tight.

The point of that testimony appears to have been to suggest that such rainfall might produce a "run-off" capable of contaminating water sources in the area. Apart from the facts that the possibility of a rainfall substantial enough to cause such a run-off is extremely remote, that the ten acres is surrounded by a trench and that the wastes in the drums are about 90 percent solid, the evidence also indicates that the site is located within the "sump" of a 30-by-35 mile sink into which all surface drainage moves and that the only potable water to be found in the entire basin—99 percent of which is owned by the former stockholders of Chemical Waste—is located on private property and enclosed by a fence with locked gates designed to deter public use.

Although the record includes some reference to public complaints concerning the presence of a "phenolic" odor characteristic of the materials stored on defendant's land, additional testimony revealed that there was no evidence that the "source" of the offensive odors had ever been traced to the site and may well have been due to the fact that roadside weeds and "many hundreds of acres of sagebrush * * *" unassociated with defendant's property had been sprayed with 2,4-D which produces an identical distinct odor. Testimony did, in fact, indicate that the odors associated with the storage site extended for a distance of no greater than one-fourth mile. In light of the fact that the nearest public road or habitation is some three miles from the storage location, this evidence tends to minimize the possibility that the site presently causes any public discomfort.

Taken as a whole this record does not indicate that

defendant's storage site constitutes a nuisance at this time.

■ The record does indicate, however, that the defendant is presently "operating" a disposal site without the license required by the legislature.[2] Because the defendant is apparently unwilling and unable to meet conditions which are a prerequisite to obtaining such a license (specifically those included in ORS 459.530(3), and 459.590(1) and (2)(f),[3] it is evident

[2] "No person shall operate a disposal site without a license therefor issued pursuant to ORS 459.410 to 459.690." ORS 459.-510 (2).

"(5) 'Disposal site' means a geographical site in or upon which environmentally hazardous wastes are stored or otherwise disposed * * *.

"(6) 'Environmentally hazardous wastes' include all of the following which are not declassified by the commission pursuant to subsection (6) of ORS 459.430:

"(a) Discarded * * * materials or residues resulting from any substance or combination of substances intended for the purpose of * * * preventing, destroying, repelling or mitigating of insects * * *." ORS 459.410(5) and (6)(a).

[3] "The application shall be accompanied by a nonrefundable fee of $5,000, which shall be continuously appropriated to the department for administrative expenses." ORS 459.530 (3).

"(1) As a condition of issuance of the license, the licensee must deed to the state all that portion of the disposal site in or upon which environmentally hazardous wastes shall be disposed of by storage. If the state is required to pay the licensee just compensation for the real property deeded to it, the licensee shall pay the state annually a fee in an amount determined by the department to be sufficient to make such real property self-supporting and self-liquidating.

"(2) Each licensee under ORS 459.410 to 459.690 shall be required to do the following as a condition to holding the license:

"* * * * *.

"(f) Maintain a cash bond in the name of the state and in an amount estimated by the department to be sufficient to cover any costs of closing the site and monitoring it or providing for its security after closure and to secure performance of license

that any application submitted would be inadequate and thus refused.

ORS 459.520 (2) provides:

> "If the license is refused, the licensee must cease operations within a time set by the commission that allows reasonable opportunity for the licensee to take such steps for the security or disposition of stored material as the commission deems necessary. The commission shall not direct removal of stored material unless an alternate site has been designated as suitable for disposal of it."

The Environmental Quality Commission may, therefore, proceed to communicate to the defendant those "steps" it deems necessary "for the security or disposition" of the pesticide wastes now stored on the Alkali Lake property. These "steps" may, dependent on prevailing circumstances, include the removal of those materials if an alternate site is designated as suitable for the storage or disposition of the materials in accordance with the Environmental Hazardous Wastes Statutes (ORS 459.410 through 459.690).

If Chemical Waste fails to comply with any order issued by the Commission—not an unlikely possibility in light of defendant's current financial status—an equitable proceeding may then be initiated pursuant to ORS 459.690[4] at which the respective obligations and

---

requirements. The bond shall remain on deposit for the duration of the license and until the site is closed, except as the bond may be released pursuant to ORS 459.600.

"* * * * *." ORS 459.590.

[4] "Whenever it appears to the department that any person is engaged * * * in any acts or practices which constitute a violation of ORS 459.410 to 459.690 * * * the department may institute proceedings at law or in equity * * * to restrain further violations thereof." ORS 459.690.

responsibilities of the parties will be judicially determined.

As noted at the beginning of this opinion, there were three rulings included in the trial court's decree. No appeal was taken from the first; we have agreed with the result as to the other two but for different reasons.

Affirmed.