Argued and submitted February 22, reversed and remanded November 10, 1999

BOISE CASCADE CORPORATION,
a Delaware corporation,
*Respondent,*

*v.*

STATE OF OREGON,
by and through the
OREGON STATE BOARD OF FORESTRY,
*Appellant.*

(93-2018; CA A100855)

991 P2d 563

John T. Bagg, Assistant Attorney General, argued the cause for appellant. With him on the briefs were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Phillip D. Chadsey argued the cause for respondent. With him on the brief were Charles F. Adams and Stoel Rives LLP.

Daniel Kearns, Reeve Kearns PC, and John D. Echeverria filed a brief *amicus curiae* for Audubon Society of Portland.

Brent D. Boger, Robin L. Rivett, and Eric Grant filed a brief *amicus curiae* for Pacific Legal Foundation, Oregon Farm Bureau, and California Farm Bureau Federation.

Before De Muniz, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

The state appeals from a jury verdict in favor of plaintiff Boise Cascade (Boise) on its claim for a temporary taking of a stand of timber in which a pair of northern spotted owls were nesting. For the following reasons, we reverse and remand.

In 1988, Boise acquired 1,770 acres of commercial timberlands in Clatsop County and conducted some logging activities on its property. Also in 1988, the Oregon Department of Fish and Wildlife designated the northern spotted owl as a threatened species. In 1990, the State Forester adopted an administrative policy precluding timber harvesting within a 70-acre area around known spotted owl nesting sites, ultimately codified as *former* OAR 629-24-809.[1] In 1991, Boise sold all of those commercial timberlands except for a 64-acre parcel (the Walker Creek site), which the buyer refused to accept due to the presence of a northern spotted owls' nest on the site. The present dispute centers around the state's refusal to permit logging on the Walker Creek site during the period that the spotted owls were nesting there.

A spotted owl had been seen on the Walker Creek site in 1986, and a pair of spotted owls nested on the site in 1990, hatching two offspring. Another spotted owl was seen on the site in 1991. A breeding pair was present on the site in 1992. In early 1992, Boise sought approval from the State Forester of its plan to harvest the timber on the site. The State Forester did not approve Boise's harvesting plan because the plan did not identify for protection 70 acres of suitable spotted owl habitat encompassing the nesting site at Walker Creek. The Board of Forestry upheld the denial of Boise's plan on the ground that the proposed plan failed to

---

[1] *Former* OAR 629-24-809 provided, in part:

"(1) Whenever the State Forester determines that an operation will conflict with protection of a nesting site of the northern spotted owl * * *, the operator must obtain the State Forester's approval of a written plan before commencing the operation. The written plan, at a minimum, must address how the operation will be conducted to provide for the following:

"(a) A 70-acre area of suitable spotted owl habitat encompassing the nest site, to be maintained as suitable spotted owl habitat[.]"

A substantially similar rule is currently found at OAR 629-665-0210.

comply with *former* OAR 629-24-809. A subsequent plan permitted Boise to log several acres of the Walker Creek site but only during time frames when no owls were nesting on the site.

Boise initiated this action for inverse condemnation, arguing that the refusal to permit it to log the Walker Creek site constituted a taking under Article I, section 18, of the Oregon Constitution, as well as under the Fifth Amendment, as applied to the states through the Fourteenth Amendment, to the United States Constitution. Boise further alleged that the restriction on logging the other acres during the owl nesting season was a temporary taking under both constitutions. The trial court dismissed the complaint. On appeal, we reversed, *Boise Cascade Corp. v. Board of Forestry*, 131 Or App 538, 886 P2d 1033 (1994), and the Supreme Court allowed review. On review, the Supreme Court affirmed in part and reversed in part, concluding that, although Boise failed to state a claim for a temporary taking of the small amount of timber that the Board of Forestry permitted to be logged, Boise did state a claim for a taking of the remainder of the Walker Creek site. *Boise Cascade Corp. v. Board of Forestry*, 325 Or 185, 935 P2d 411 (1997).[2]

On remand, Boise dropped its claim under the Oregon Constitution and proceeded only on its federal constitutional claim. Boise moved for partial summary judgment, and the trial court ruled as a matter of law that a regulatory taking had occurred. The question of damages was tried to a jury, as was a question as to whether a taking by "physical invasion" had occurred. Meanwhile, one of the spotted owls on the Walker Creek site had died and the other had left the site, and all restrictions on logging the site were lifted. The jury returned a verdict for Boise, and the trial court entered judgment for Boise in the amount of $2,279,223 in damages for the temporary restriction on its logging of the Walker Creek site. This appeal ensued.

On appeal, the state makes numerous arguments that the trial court erred in failing to dismiss the claim, in

---

[2] The court's decision covered other subjects as well, but they are not pertinent to this appeal.

granting partial summary judgment, in limiting the state's evidence, in instructing the jury, and in various ·other regards. We turn first to the state's argument that the trial court lacked jurisdiction by reason of the Eleventh Amendment to the United States Constitution.

The state argues that there is no direct right of action under the Fifth and Fourteenth Amendments to the United States Constitution against the state in a state court. The state maintains that, although Congress can, and has, abrogated the states' immunity from suit by way of its power to enforce the Fourteenth Amendment, Boise has not pleaded its case under any statute that abrogates the state's immunity, *e.g.*, 42 USC § 1983. Although the state acknowledges that a number of takings claims under the federal constitution have proceeded in Oregon courts throughout the years, it argues that the sovereign immunity question was not raised and thus was not addressed in those cases.

Boise responds that, although the Eleventh Amendment may bar plaintiffs from pursuing federal constitutional claims against states in federal court, it "has nothing to do with barring a plaintiff from bringing a takings claim against the State, based on the federal constitution, in the Oregon courts[.]" Until quite recently, Boise's position on this question seemed unassailable. *See, e.g., Hilton v. South Carolina Public Railways Com'n*, 502 US 197, 204-05, 112 S Ct 560, 116 L Ed 2d 560 (1991) ("But as we have stated on many occasions, 'the Eleventh Amendment does not apply in state courts.'"). However, in a recent series of cases, the United States Supreme Court has significantly altered its position on the question of states' sovereign immunity. Most directly on point is *Alden v. Maine*, 527 US 706, 119 S Ct 2240, 144 L Ed 2d 636 (1999), which concerned an attempt by state employees to enforce the Fair Labor Standards Act (FLSA), 29 USC § 201 *et seq.*, against the state in a state court proceeding. Although the FLSA contains a provision purporting to authorize actions against states in their own courts, the Court held that "the powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts." 119 S Ct at 2246.

The Court first acknowledged that the text of the Eleventh Amendment does not actually address the question of when a state may be sued in its own courts.[3] *Id.* However, after reviewing at length the history of the Tenth and Eleventh Amendments, and its own earlier case law upholding the states' "sovereign immunity in various contexts falling outside the literal text of the Eleventh Amendment," *id.* at 2253, the Court concluded that basing decisions concerning states' immunity on the text of the amendment alone would constitute "ahistorical literalism[.]" *Id.* at 2254. Although acknowledging Congress's power to enact legislation such as the FLSA via the Commerce Clause, the Court concluded that Congress did not have the power to abrogate states' sovereign immunity in doing so. *Id.*

The Court went on to indicate, though, that sovereign immunity would "not bar all judicial review of state compliance with the Constitution[.]" *Id.* at 2266. In particular, the Court pointed out:

> "We have held also that in adopting the Fourteenth Amendment, the people required the States to surrender a portion of the sovereignty that had been preserved to them by the original Constitution, so that Congress may authorize private suits against nonconsenting States pursuant to its § 5 enforcement power. *Fitzpatrick v. Bitzer*, 427 US 445[, 96 S Ct 2666, 49 L Ed 2d 614] (1976). By imposing explicit limits on the powers of the States and granting Congress the power to enforce them, the Amendment 'fundamentally altered the balance of state and federal power struck by the Constitution.' *Seminole Tribe [of Fla. v. Florida*, 517 US 44, 59, 116 S Ct 1114, 134 L Ed 2d 252 (1996)]. When Congress enacts appropriate legislation to enforce this Amendment, *see City of Boerne v. Flores*, 521 US 507[, 117 S Ct 2157, 138 L Ed 2d 624 (1997)], federal interests are paramount, and Congress may assert an authority over the States which would be otherwise unauthorized by the Constitution. *Fitzpatrick, supra*, at 456." *Alden*, 119 S Ct at 2267.

---

[3] The Eleventh Amendment to the United States Constitution provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

■ In summary, the Court has declared that, even if a state has not waived its sovereign immunity, Congress may, pursuant to the enforcement power granted it by section 5, of the Fourteenth Amendment,[4] enact legislation to enforce constitutional rights that have been made applicable to the states through the Fourteenth Amendment. It is not disputed that the just compensation clause of the Fifth Amendment applies to the states through the Fourteenth Amendment. The question, then, is whether plaintiff's only remedy for the constitutional violation it alleges is through a positive enactment of Congress, such as 42 USC § 1983, as the state posits.

■ The parties cite no provision other than 42 USC section 1983 as an affirmative act of Congress that would abrogate the states' sovereign immunity and subject it to takings claims in state courts, and we are aware of none.[5] However, we do not find the state's answer to this issue—that plaintiff failed to state a claim because it did not proceed under 42 USC section 1983—to be satisfactory. Section 1983 actions may be brought against "persons," but a state is not a "person" for purposes of section 1983. *Will v. Michigan Dept. of State Police*, 491 US 58, 64, 109 S Ct 2304, 105 L Ed 2d 45 (1989). As noted above, though, the Fourteenth Amendment provides that no *"state* [shall] deprive any person of * * * property, without due process of law," and the Fifth Amendment, incorporated as to the states through the Fourteenth Amendment, calls for "just compensation" for a taking of property. (Emphasis added.) In short, section 1983 does not

---

[1] The Fourteenth Amendment to the United States Constitution provides, in part:

"Section 1. * * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

"* * * * *

"Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

[5] The state concedes that Congress has authority to subject it to suit in state court without its consent. We recognize that *Alden* may well be read to indicate otherwise, but we will treat the state's concession in this case as a partial waiver of any sovereign immunity defense that it is immune from suit in state court even if Congress has the authority to subject it to suit in federal court.

provide for the remedy required by the constitution for a taking of property by the *state*.

Thus, the question comes down to whether Boise can maintain an inverse condemnation action against the state in state court, based on an alleged violation of the Fifth Amendment to United States Constitution, in the absence of congressional action pursuant to section five of the Fourteenth Amendment authorizing such an action. As a general matter, the *Alden* decision discussed above might suggest that the answer is "no," because of its emphasis on positive acts of Congress under section five of the Fourteenth Amendment. However, certain language in the *Alden* decision, particularly when read in conjunction with some of the Court's earlier case law describing the Fifth Amendment as "self-executing," casts doubt on such a conclusion. In *Alden*, the Court distinguished the issue before it from the issue presented in *Reich v. Collins*, 513 US 106, 115 S Ct 547, 130 L Ed 2d 454 (1994):

> "In *Reich v. Collins*, 513 US 106 (1994), we held that, despite its immunity from suit in federal court, a State which holds out what plainly appears to be a 'clear and certain' postdeprivation remedy for taxes collected in violation of federal law may not declare, after disputed taxes have been paid in reliance on this remedy, that the remedy does not in fact exist. *Id.* at 108. This case arose in the context of tax-refund litigation, where a State may deprive a taxpayer of all other means of challenging the validity of its tax laws by holding out what appears to be a 'clear and certain' postdeprivation remedy. *Ibid.; see also Fair Assessment in Real Estate Assn., Inc. v. McNary*, 454 US 100[, 102 S Ct 177, 70 L Ed 2d 271] (1981). *In this context, due process requires the State to provide the remedy it has promised. Cf. Hudson v. Palmer*, 468 US 517, 539[, 104 S Ct 3194, 82 L Ed 2d 393] (1984) (O'Connor, J., concurring). *The obligation arises from the Constitution itself*; *Reich* does not speak to the power of Congress to subject States to suits in their own courts." *Alden*, 119 S Ct at 2259 (emphasis added).

Although *Reich* has little direct bearing on the issue before us, as it did not involve any issues of sovereign immunity, the Court's description of *Reich* in *Alden* strongly suggests that states may be required to provide promised remedies in state court proceedings by force of the Due Process Clause alone.

Further support for this idea that the Constitution itself may dictate the availability of remedies in state court under certain circumstances can be found in *First Lutheran Church v. Los Angeles County*, 482 US 304, 107 S Ct 2378, 96 L Ed 2d 250 (1987). Although *First Lutheran* did not squarely present the type of sovereign immunity issue with which we are confronted, it provides significant guidance on the issue. In *First Lutheran*, the plaintiff sued a county after it adopted an interim ordinance that temporarily banned construction within a flood zone. 482 US at 307-08. The focus of the case was whether a temporary regulatory taking constituted a taking under the Fifth Amendment. It does not appear from the text of the opinion that a sovereign immunity defense was raised. However, the Solicitor General, an *amicus* in the case, did make a sovereign immunity argument that the Court addressed:

> "We have recognized that a landowner is entitled to bring an action in inverse condemnation as a result of 'the self-executing character of the constitutional provision with respect to compensation * * *.' *United States v. Clarke*, 445 US 253, 257, 100 S Ct 1127, 63 L Ed 2d 373 (1980), quoting 6 P. Nichols, *Eminent Domain* § 25.41 (3d rev ed 1972). As noted in Justice Brennan's dissent in *San Diego Gas & Electric Co.*, 450 US [621], 654-55, 101 S Ct 1287, 67 L Ed 2d 551 [(1981)], it has been established at least since *Jacobs v. United States*, 290 US 13, 54 S Ct 26, 78 L Ed 142 (1933), that claims for just compensation are grounded in the Constitution itself:
>
>> " 'The suits were based on the right to recover just compensation for property taken by the United States for public use in the exercise of its power of eminent domain. *That right was guaranteed by the Constitution.* The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. A promise to pay was not necessary. Such a promise was implied because of the duty to pay imposed by the Amendment. *The suits were thus founded upon the Constitution of the United States.' Id.* at 16, 54 S Ct 26, 78 L Ed 142. (Emphasis added [by *First Lutheran* court])."

"*Jacobs*, moreover, does not stand alone, for the Court has frequently repeated the view that, in the event of a taking, the compensation remedy is required by the Constitution. *See, e.g., Kirby Forest Industries, Inc. v. United States*, 467 US 1, 5, 104 S Ct 2187, 81 L Ed 2d 1 (1984); *United States v. Causby*, 328 US 256, 267, 66 S Ct 1062, 90 L Ed 1206 (1946); *Seabord Air Line R. Co. v. United States*, 261 US 299, 304-306, 43 S Ct 354, 67 L Ed 664 (1923); *Monongahela Navigation* [*Co. v. United States*, 148 US 312, 13 S Ct 622, 37 L Ed 463 (1893)].[9]

---

"[9] The Solicitor General urges that the prohibitory nature of the Fifth Amendment * * * combined with principles of sovereign immunity, establishes that the Amendment itself is only a limitation on the power of Government to act, not a remedial provision. The cases cited in the text, we think, refute the argument of the United States that 'the Constitution does not, of its own force, furnish a basis for a court to award money damages against the government.' Brief for United States as *Amicus Curiae* 14. Though arising in various factual and jurisdictional settings, these cases make clear that it is the Constitution that dictates the remedy for interference with property rights amounting to a taking. *See San Diego Gas & Electric Co. v. San Diego*, 450 US 621, 655 n 21, 101 S Ct 1287, 67 L Ed 2d 551 (1981) (Brennan, J., dissenting), quoting *United States v. Dickinson*, 331 US 745, 748, 67 S Ct 1382, 91 L Ed 1789 (1947)." *First Lutheran*, 482 US at 315-16.

██ Piecing together the Court's various statements in *First Lutheran* with its description of *Reich* in *Alden*, we conclude that the Court, in its recent Eleventh Amendment decisions, did not intend to abandon the notion that at least some constitutional claims are actionable against a state, even without a waiver or congressional abrogation of sovereign immunity, due to the nature of the constitutional provision involved. We recognize that our conclusion on this point is not beyond dispute. *See, e.g., Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F2d 704, 705 (9th Cir 1992), *cert den* 506 US 1081 (1993) (Takings plaintiff had "no cause of action directly under the United States Constitution. We have previously

held that a litigant complaining of a violation of a constitutional right must utilize 42 USC § 1983[.]"). However, particularly in light of the Court's rejection of the *amicus curiae*'s sovereign immunity argument in *First Lutheran*, and in light of the fact that the state has explicitly disavowed any reliance on *Alden* in the present case, we conclude that *Alden* should not be read so broadly as to dictate that states may not be sued in state courts on federal takings claims unless they have specifically waived their sovereign immunity. We conclude that, because of the "self-executing" nature of the Fifth Amendment, as applied to the states through the Fourteenth Amendment, a state may be sued in state court for takings in violation of the federal constitution.

The state next argues that the trial court erred in denying its motion to dismiss for failure to state a claim under either of two theories: the *Lucas* theory (deprivation of all beneficial use of property) and the *Loretto* theory (physical occupation of property). *See generally Lucas v. South Carolina Coastal Council*, 505 US 1003, 112 S Ct 2886, 120 L Ed 2d 798 (1992); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 102 S Ct 3164, 73 L Ed 2d 868 (1982). To state a claim under the Fifth Amendment for a taking under a *Lucas* theory, the property owner must allege that a governmental action has deprived the owner of all economically beneficial use of the property. Both this court and the Oregon Supreme Court concluded that plaintiff had stated a claim under this type of theory in the course of the previous appeal. *See Boise Cascade*, 131 Or App at 551 ("plaintiff alleges, in essence, that the government has regulated its property in such a way that productive uses are unavailable and all viable economic and beneficial use has been eliminated. Those allegations suffice to state regulatory taking claims under * * * *Lucas*"); *Boise Cascade*, 325 Or at 198 (Plaintiff's allegations were "sufficient to meet the 'deprivation of all economically viable use of the property' standard. The Court of Appeals was correct in so holding."). Although plaintiff amended its pleadings after remand, the amended pleadings, insofar as the *Lucas* theory of recovery is concerned, are much the same as its pleadings discussed in the previous appellate decisions in this case. Plaintiff alleged that the state has regulated its property in such a way that all viable

economic and beneficial use of the property was eliminated. The trial court properly denied the state's motion to dismiss on the ground that plaintiff failed to state a claim under the *Lucas* theory.

The state also moved to strike plaintiff's allegations that it had suffered a *per se* taking by means of a "permanent physical occupation" in violation of the Fifth Amendment. In its complaint, plaintiff alleged that the administrative rules described above required plaintiffs to maintain spotted owl nests and prevent their abandonment so the nests could be occupied annually by a pair of breeding owls and that the state's denial of plaintiff's plan to harvest the timber constituted a *per se* taking.

The *Loretto* case concerned "whether a minor but permanent physical occupation of an owner's property authorized by government constitutes a 'taking' of property for which just compensation is due under the Fifth and Fourteenth Amendments." 458 US at 421. The state argues that the court erred in denying its motion to strike this count of plaintiff's claim because plaintiff has not alleged the type of physical occupation at issue in *Loretto*. We agree.

In *Loretto*, the challenged statute required landlords to permit cable television companies to install devices on their property. *Id.* There, the Court recounted at length the historic distinctions between takings involving permanent physical invasion of property and regulations that place restrictions on the use of property. 458 US at 427-35. One of the early physical invasion cases that the Court discussed in *Loretto* was *Pumpelly v. Green Bay Co.,* 80 US (13 Wall) 166, 20 L Ed 557 (1871), in which the Court held that "where real estate is actually invaded by *superinduced* additions of water, earth, sand or other material, or by having any *artificial* structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking[.]" (Emphasis added.) *Pumpelly* involved a situation where the government *caused* a party's land to become flooded. However, the Court's "physical occupation" jurisprudence in no way suggests that the same takings analysis would apply where, for example, a natural flood occurred and government regulations pertained to how a landowner was to deal with floodwaters on his or her

land. *Compare Pumpelly,* 80 US at 177-78 (where government caused property to flood by constructing a dam, there was a taking by "physical occupation"), *with First Lutheran*, 482 US at 308 (where flood occurred as a consequence of a forest fire destroying a watershed area, government regulation of construction within flood zone was analyzed under regulatory takings case law).

■ As the state points out, there are significant differences between a government authorizing or conducting a physical invasion of the property of another and a government regulating what one may do with property due to the random or incidental location of a natural resource or wild animal on the property. The state has no control over where spotted owls choose to nest. The natural occurrence of a pair of breeding spotted owls on a piece of property is more akin to the naturally occurring flood in our hypothetical described above than to a flood caused by the government's construction of a dam, as was the case in *Pumpelly*, or to the installation of an artificial structure such as a cable television box, as was the case in *Loretto*.

The state did not cause or induce the spotted owls to breed on plaintiff's property. The state simply regulated plaintiff's use of the property based on the presence of the spotted owls there. Although plaintiffs have stated a claim for a regulatory taking, they have not stated a claim for a "physical occupation" taking under *Loretto*. The trial court erred in concluding otherwise.

■ However, that conclusion does not end our inquiry. As noted, plaintiff pleaded two theories in alternative counts as part of its takings claim. Although the court should have stricken the *Loretto* count, it properly denied the state's motion to dismiss the regulatory taking count. As noted above, the trial court granted plaintiff summary judgment on its regulatory taking count and submitted the *Loretto* count to the jury. In response to a separate question, the jury also determined damages, but it is undisputed that the damages under either theory would be the same. Thus, although the submission of plaintiff's *Loretto* theory to the jury was erroneous, the jury's damage award nevertheless was proper if

the trial court correctly decided the regulatory taking question. This is not a situation where we cannot tell what theory the jury followed in reaching its conclusion. *Cf. Whinston v. Kaiser Foundation Hosp.*, 309 Or 350, 357, 788 P2d 428 (1990) (where more than one theory is submitted to the jury and some are unsupported by the evidence, but it cannot be determined on which allegation the jury based its verdict, a new trial must be granted). Only one theory of liability was before the jury here, and even though it was not properly before the jury, the damages question, which applied in the same manner to both takings theories, was properly before the jury and would have been properly before the jury even if the trial court had correctly stricken the *Loretto* count from plaintiff's takings claim. We therefore turn to the pleading issues pertaining to the regulatory taking claim.

The state argues that the trial court erred in striking its defense that Boise's proposed logging would constitute a nuisance and that the state cannot be liable for refusing to permit Boise to perform acts that constitute a nuisance and violate the law. In *Lucas*, the Court noted that there would be no taking if "the proscribed use interests were not part of [the property owner's] title to begin with." 505 US at 1027. The Court further noted that such limitations "must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Id.* at 1029. The state's defense at issue here appears to rest on this part of the *Lucas* case.

■ The state offers no authority for the proposition that knocking down a bird's nest on one's property has ever been considered a public nuisance. The case on which it relies, *Columbia Fishermen's Union v. St. Helens*, 160 Or 654, 87 P2d 195 (1939), concerned a suit by fishermen to enjoin the city of St. Helens from dumping raw sewage into the Columbia River—a practice which, needless to say, was detrimental to the fish population on which the fishermen depended for their livelihoods. That case concluded that the fisherman had standing to maintain an action against the city. *Id.* at 666.

However, any analogy to the present case is less than clear. The court in *Columbia* indicated that the state could protect its navigable waters from pollution because it

had an interest in *ferae naturae* (the fish) in the waters. It does not follow, as the state seems to posit, that any act taken by the state to protect *ferae naturae* on private property is the equivalent to an abatement of a public nuisance or, alternatively, any act by a private party to destroy *ferae naturae* on private property constitutes a public nuisance. *Cf. State Dept. of Env. Qual. v. Chem. Waste*, 19 Or App 712, 719, 528 P2d 1076 (1974) ("defendant has been 'operating' the site in violation of the Environmentally Hazardous Wastes Statutes from the time they became effective in early 1972, [but] that continuing violation does not require a finding that the site constitutes a public nuisance"). The trial court correctly struck the state's defense that plaintiff's proposed logging constituted a public nuisance.

In its final assignment of error concerning the pleadings, the state argues that the trial court erred in striking its defense that it labeled as "failure to exhaust its administrative remedies." The state argues that Boise's regulatory takings claim is unripe because it did not make an effort to obtain an "incidental take" permit pursuant to 16 USC section 1539(a). *Former* OAR 660-24-809(5) provided that "[e]xceptions to the requirements for protecting northern spotted owl nesting sites may be approved by the State Forester if the operator has obtained an incidental take permit from federal authorities under the federal Endangered Species Act." The state argues that, because plaintiff did not attempt to avail itself of this exception, it may not yet assert a takings claim. The trial court granted Boise's motion to strike this defense without stating its reason for doing so. We therefore examine all of the arguments made to the trial court on this issue in order to determine if the trial court erred in striking this defense.

■ As an initial matter, Boise correctly points out that the state's argument is not so much an exhaustion of remedies argument as it is a ripeness argument. However, the terminology used in the caption is not dispositive here, as the parties clearly addressed the issue in the lower court as a ripeness issue, and Boise does not contend that the state failed to preserve this issue. We do not consider a mislabeling of a caption in the pleadings to be dispositive where the body of the pleading adequately describes the nature of the

defense that is being asserted. *See Curran v. ODOT*, 151 Or App 781, 786 n 4, 951 P2d 183 (1997) (concluding under similar circumstances that ripeness issue was preserved).

Both parties agree that the relevant concept is laid out in the Court's decision in *Williamson Planning Comm'n v. Hamilton Bank*, 473 US 172, 105 S Ct 3108, 87 L Ed 2d 126 (1985).[6] In *Williamson*, the plaintiff sought to develop certain property based on the preliminary approval of a plat map that had been obtained by its predecessor in interest. The planning commission disapproved the development because it failed to comply with numerous zoning ordinances. *Id.* at 176-83. Rather than applying for variances from the zoning ordinances, the plaintiff sought just compensation under the Fifth Amendment. The Court looked to its earlier cases, *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 US 264, 101 S Ct 2352, 69 L Ed 2d 1 (1981), and *Agins v. Tiburon*, 447 US 255, 100 S Ct 2138, 65 L Ed 2d 106 (1980), stating that

> "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson*, 473 US at 186.

The Court quoted from *Hodel*:

> "There is no indication in the record that appellees have availed themselves of the opportunities provided by the Act to obtain administrative relief by requesting either a variance * * * or a waiver * * *[.] If [the property owners] were to seek administrative relief under these procedures, a mutually acceptable solution might well be reached with regard to individual properties, thereby obviating any need

---

[6] In *Williamson*, the Court explained the distinction between "exhaustion of remedies" and "ripeness" as follows:

"While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decision-maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate."

to address the constitutional questions. The potential for such administrative solutions confirms the conclusion that the taking issue * * * simply is not ripe for judicial resolution." 452 US at 297.

The *Williamson* Court went on to note that, in *Agins*, the property owners had submitted a plan that was disapproved but, as they had not sought approval of any other type of plan, it "was not clear whether the Commission would deny approval for all uses that would enable the plaintiffs to derive economic benefit from the property." 473 US at 187. The *Williamson* Court concluded that the claim was unripe for the same reason that the claim in *Hodel* was unripe: had the plaintiff sought and obtained available variances and waivers, the parties might have reached a mutually acceptable solution. *Id.* at 188-90; *cf. Curran v. ODOT*, 151 Or App at 787 (addressing ripeness problem under Article I, section 18, of the Oregon Constitution, the court concluded that plaintiff's failure to apply for a permit that could have obviated "takings" meant that plaintiff's claim was not ripe); *Nelson v. Multnomah County*, 121 Or App 119, 122, 854 P2d 476, *adhered to on recons* 123 Or App 300, 859 P2d 574 (1993) (recognizing rule that if a landowner has unsuccessfully filed an application but has pursued no alternatives that could lead to approval, a takings claim is unripe).

■ The state maintains that plaintiff's claim suffers the same flaw as did the claims of the plaintiffs in *Williamson* and *Hodel*. The state argues that plaintiff's failure to seek an "incidental take" permit from the United States Fish and Wildlife Service pursuant to 16 USC section 1539(a), which is a prerequisite to any variance under *former* OAR 660-24-809(5) for destruction of northern spotted owl habitat, creates a ripeness problem similar to the ripeness problems of the plaintiffs in *Williamson* and *Hodel* due to their failure to seek variances that could have obviated the problem.

■ Boise responds by making several points. First, it notes that it is undisputed that, even if Boise had obtained an incidental take permit from the United States Fish and Wildlife Service, the state would not have been obliged to approve Boise's logging plan. That is true; under *former* OAR 660-24-809(5), an incidental take permit is a prerequisite to state

approval of a logging plan that destroys spotted owl habitat, but an incidental take permit does not, in itself, guarantee that the logging plan will be approved. However, nothing in *Williamson, Hodel* or *Agins* implies that a waiver or variance must be a "sure thing" in order for a plaintiff to be required to pursue such a remedy before bringing a takings claim.

■ Boise also suggested, in the course of its arguments on this issue to the trial court, that no incidental take permit would have been required in any event, for several reasons. First, Boise asserted that the Endangered Species Act only prohibits "taking" an endangered species, and destroying an endangered species' habitat does not fall within the definition of "take":

"The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 USC § 1532(19).

We disagree with plaintiff's assertion that the definition of "take" does not encompass destruction of habitat. In *Babbitt v. Sweet Home Chapter, Etc.*, 515 US 687, 115 S Ct 2407, 132 L Ed 2d 597 (1995), the Court upheld an Interior Department rule that defined "harm" as including destruction of endangered species' habitat. *See also Palila v. Hawaii Dept. of Land and Natural Resources (Palila II)*, 852 F2d 1106, 1108 (9th Cir 1988) (same).

Boise also suggested in the trial court that, because the United States Department of Fish and Wildlife had enacted a regulation defining critical habitat for the spotted owl on federal lands but not on private land, Boise somehow was exempted from any requirement that it acquire an "incidental take" permit before taking owls on its private property. Boise argued:

"[T]he USF&WS had published in the Federal Register its own regulations governing the Northern Spotted Owl. 57 Fed Reg 1796-01 (Jan 15, 1992 WL4601 (F.R.)). In that document it defined the critical habitat for the bird's recovery. It made a specific finding that private lands were not included in critical habitat, even where the surrounding federal lands had been so designated. Clatsop County contains no federal critical habitat areas for the Northern Spotted Owl and even the more than 100,000 acres of State

commercial timberlands in the county have not been so designated."

It is unsurprising that the regulation found at 57 Fed Reg 1796 (January 15, 1992) referred only to critical habitat on federal lands, given that the regulation pertains only to section 7 of the Endangered Species Act, which is a section that sets forth the obligations of federal agencies in protecting endangered species. The prohibition on "*any person*" taking an endangered species, by contrast, is contained in section 9 of the Act,[7] which has a broader application that section 7. The "incidental take" provisions are cross-referenced in section 1538, which pertains to "any person." The "incidental take" provisions are not limited to federal agency protection of endangered species under section 7. The summary of the regulation itself stated: "This critical habitat designation provides *additional* protection requirements under section 7 of the Act with regard to activities that are funded, authorized, or carried out by a Federal agency." 57 Fed Reg 1796 (January 15, 1992) (emphasis added). We conclude that this regulation has no direct bearing on whether Boise was excused, as a matter of law, from seeking an incidental take permit under the Endangered Species Act as a prerequisite to the ripening of its takings claim against the state.[8]

Finally, Boise has suggested that it may be inferred from one of its trial exhibits that the state as much as admitted that it would not have approved Boise's logging plan even if Boise had applied for an incidental take permit. We understand Boise's argument to be an invocation of the "futility"

---

[7] 16 USC § 1538(1) provides, in part:

"(a) Generally:

"(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—

"* * * * *

"(B) take any such species within the United States or the territorial sea of the United States[.]"

[8] It is possible that the designation of critical habitat on federal lands could, in fact, affect whether or how incidental take permits are granted for taking endangered species on private lands. That, however, has no bearing on whether the state's defense based on Boise's failure to even attempt to get an incidental take permit should have been stricken from the pleadings.

exception to the ripeness requirement. *See generally Larson*, 121 Or App at 122 (describing "futility" exception).

 For two reasons, either of which is independently dispositive, we reject Boise's assertion of futility. First, the question before us is whether the trial court erred in striking the state's defense on the pleadings; that question cannot be answered by reference to a trial exhibit that might, as a factual matter, be determinative of whether the state *prevailed* on that defense. Second, assuming for the sake of argument that that were not the case, the trial exhibit to which Boise refers does not indicate that it would be futile for Boise to obtain an incidental take permit. Rather, it indicates that the state's decision would not depend solely on the issuance of such a permit and that a decision by the federal government that such a permit was not required would not satisfy the Oregon Administrative Rule. One of the state's trial exhibits, on the other hand, is a letter of advice to Boise from the Assistant Regional Director of the United States Department of the Interior Fish and Wildlife Service indicating that "an incidental take permit *is* required when otherwise lawful activities will incidentally take a threatened species" and suggesting that they should visit the proposed logging site, after which the agency "should be better able to discuss the situation and advise you regarding [an] incidental take permit." Neither of these trial exhibits, alone or together, indicate that it would have been futile for Boise to pursue an incidental take permit. We conclude that none of Boise's arguments in support of its motion to strike the state's defense that the claim was not ripe are meritorious. The trial court erred in striking the state's defense.

Because of our disposition of this assignment of error, we need not reach the state's numerous assignments of error pertaining to the conduct of the trial.

Reversed and remanded.