Argued and submitted August 4, 2004, judgment vacated; remanded with instructions to dismiss December 21, 2005, petition for review denied May 23, 2006

(340 Or 672)

# Richard J. MURRAY
## and Georgiana Murray,
*Respondents,*

*v.*

## STATE OF OREGON,
*Appellant,*

*and*

## COLUMBIA RIVER GORGE COMMISSION,
### and Friends of the Columbia Gorge, Inc.,
*Intervenors - Appellants.*

## CC 97-12; A117707

124 P3d 1261

Denise J. Fjordbeck, Assistant Attorney General, argued the cause for appellant State of Oregon. With her on the briefs were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, Jas. Jeffrey Adams, Assistant Attorney General, and David F. Coursen, Assistant Attorney General.

Jeffrey B. Litwak argued the cause and filed the briefs for intervenor - appellant Columbia River Gorge Commission.

Gary K. Kahn argued the cause for intervenor - appellant Friends of the Columbia Gorge, Inc. With him on the briefs was Reeves, Kahn & Hennessy.

Andy Simrin argued the cause for respondents. With him on the brief was Theodore E. Sims.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Deits, Judge pro tempore.

DEITS, J. pro tempore.

## DEITS, J. pro tempore

Defendant, State of Oregon, and intervenors, Columbia River Gorge Commission (commission) and Friends of the Columbia Gorge, Inc. (Friends), appeal the trial court's entry of judgment in favor of plaintiffs, Richard and Georgiana Murray, on their inverse condemnation claim. The trial court concluded that a 1994 trial court judgment effected a taking of plaintiffs' property and awarded just compensation of $222,000 and attorney fees of $41,594.75. We reverse.

The commission is a bistate entity made up of representatives of the states of Oregon and Washington. 16 USC § 544c(a) (2000). It was created by Congress under the Columbia River Gorge Compact (the compact) for the purpose of managing natural resources on both sides of certain portions of the Columbia River. 16 USC § 544a. The compact was adopted by both Oregon and Washington. ORS 196.150; Wash Rev Code § 43.97.015. Under the Columbia River Gorge National Scenic Area Act (the Act), 16 USC §§ 544 - 544p, the commission has regulatory authority to manage the natural resources within the Columbia River Gorge National Scenic Area (the Gorge NSA). 16 USC § 544c(a). The commission is made up of six members appointed by the governors of Oregon and Washington, six members appointed by the counties within the scenic management area, and one nonvoting member who is an employee of the U.S. Forest Service. *Id.*

The Act requires the commission to designate land used or suitable for agriculture, forest, open space, commercial development, and residential development. 16 USC § 544d(b). It also requires the commission to develop a management plan and to operate under interim guidelines until a management plan is finalized. 16 USC § 544d(c), (d); 16 USC § 544h.[1] The Act provides that both the commission's interim guidelines and its management plan protect and preserve agricultural land for agricultural uses. 16 USC § 544d(d)(1). It states that any residential development or development of

---

[1] The interim guidelines were in effect at the time of the pertinent events in this case.

mineral resources must not adversely affect cultural and other resources. 16 USC § 544d(d)(8), (9). The Final Interim Guidelines developed for the Gorge NSA provided that a multistep process must be undertaken to protect cultural resources: first, a cultural survey must be performed for new development that will result in ground disturbance; second, the significance of anything found in the survey must be evaluated and the effects of the proposed development on the cultural resources must be assessed; and, third, a mitigation plan must be developed if it is determined that the proposed activity will affect cultural resources.[2]

The commission also adopted rules that set out the process for applications for proposed land use activities in the Gorge NSA. Under the rules, major development actions, including partitions and mineral exploitation, require commission review and approval. OAR 350-020-0002(8); OAR 350-020-0003. Such applications must include a description of any cultural resources on the affected property. OAR 350-020-0005(2)(l). The director of the commission makes the initial decision regarding the consistency of the proposal with the Act and the applicable plan and regulations. OAR 350-020-0010. The director's decision may be appealed to the commission. OAR 350-020-0011; OAR 350-020-0018. The order issued by the commission is final and, in Oregon, is reviewable by the Oregon Court of Appeals. 16 USC § 544m(b)(4), (6); OAR 350-020-0019.

The property at issue here is located in the Gorge NSA in Wasco County and consists of 20.5 acres. It was originally part of a 2,500 acre ranch. The ranch owners decided to sell the parcel when it was cut off from the rest of the ranch by a new road. In early 1990, before the sale of that property to plaintiffs was final, plaintiff Georgiana Murray submitted an application to the commission requesting permission to build a single-family residence on the property. The commission denied the application on the basis that the property was part of a viable farming operation and, also, because a cultural resource inventory of the property had not been

---

[2] That process was also included in the management plan that was finally approved by the commission and also is included in the commission's rules for cultural resource review. OAR 350-080-0540.

performed. The commission explained in its decision that an archaeologist had surveyed the property and had discovered cultural materials. The archaeologist recommended that, if any excavation work were to be undertaken on the property, a professional archaeologist should be present on the property when the work was conducted. He also recommended that, if additional cultural materials were found, work on the property should cease in order to allow the nature and significance of the materials to be evaluated.

Later in 1990, and after the commission's denial of plaintiffs' application for a residence, plaintiffs purchased the property for $14,625. In an addendum to the purchase contract, plaintiffs specifically acknowledged that the property was within the Gorge NSA and was subject to the restrictions of the Act. In December 1990, plaintiff Richard Murray[3] submitted to the commission a land use application for a partition of the property. A development review was prepared by the commission's staff archaeologist. The review noted that Native Americans had quarried the site and manufactured tools in the area. The archaeologist recommended that a complete archaeological survey be done on the property before any action was taken on the application. The commission denied the application on the basis that the partition would be inconsistent with the Act and the commission's regulations because an increase in the number of nonfarm dwellings in the area would further fragment agricultural lands.

In December 1992, Murray submitted another application for a partition of the land. It was denied in January 1993. The notice of decision on that application stated, in part:

> "Before any development is approved by the Commission, a complete cultural resource survey of the subject parcel must be completed to determine the significance of the discovered material and what measures should be taken to protect the resource."

In 1992, Murray sought permission to build a barn on the property. The application was granted. However, in reviewing the requests related to the construction of the

---

[3] All references to "Murray" are to Richard Murray.

barn, the Forest Service found the proposal to be consistent with the Act but noted that, when its employees conducted an on-site inspection, they found that the applicant appeared to have destroyed archaeological materials during excavation and earth movement on the property. In May 1993, Murray applied for renewal of the permit to build a barn, which was granted.

In April 1992, Murray submitted an application to the commission to conduct mining operations on the property. The application was found to be incomplete because the required plans for the activity were not included. When the commission staff visited the property concerning the application, they also found that Murray had excavated surface material and had a pile of aggregate materials on the property. Murray was told at that time that mining activities could not occur on the property without commission approval. He denied that he was conducting mining activities on the property and did not complete his application.

In April 1993, Murray submitted a new application to the commission seeking approval of a quarry operation on the property. In a letter dated June 17, 1993, the commission's director advised Murray that a cultural resources inventory of the property must be completed before the application could be processed. The director explained in the letter:

> "The Gorge Commission recently received a report from Thomas Turck, archaeologist with the U.S. Forest Service, Scenic Area Office, regarding a preliminary review of the proposed project and site for the presence of cultural resources. This report (a copy of which is enclosed herein) indicates that a Native American cultural resource site was found on this property in 1990. The report also indicates that the site was bulldozed subsequent to the reconnaissance survey. Due to the ground-disturbing nature of the proposed development, Mr. Turck recommends that a professional archaeological assessment of the property take place, to assess the condition of remnants of this archaeological site.

> "Due to the presence of archaeological resources which have not yet been evaluated for significance, and the

ground-disturbing nature of your proposal, we cannot conclude that the proposal will not adversely affect cultural resources with the information available at this time. For this reason, a cultural resource survey is required. This will allow a definitive determination of the potential significance of resources on the site and what, if any, mitigation measures would need to be applied to avoid adverse effects to cultural resources.

"A cultural resource survey and assessment of significance will need to be done by a professional archaeologist with a background in lithic deposits. This work should also include recommended mitigation measures to protect any cultural resources determined to be significant in the assessment. The archeologist should submit a proposed survey design for my approval prior to the start of this work. Once completed, the report should be submitted to me. Once I have reviewed the report and determined its adequacy, I will be prepared to issue a decision on your application. I have enclosed a list of consulting archaeologists. We will be glad to furnish any information required to the archaeologist you hire.

"I would appreciate hearing back from you as soon as possible. We will try to contact you in a few days to resolve this matter in a mutually agreeable way. Thank you for your cooperation."

Murray responded to this letter by a letter dated June 18, 1993, which stated:

"Dear Mr. Doherty:

"No.

"Sincerely,

"/s/ Richard J. Murray."

After Murray's response, on June 23, 1993, the director issued a decision, concluding that the mining activity would not convert the land from agricultural use, that the quarry would not adversely affect scenic resources if appropriate conditions were attached, and that recreational and natural resources would not be adversely affected. However, the director also concluded that prior surveys had revealed the presence of prehistoric cultural materials on the property. The director explained:

"A complete cultural resource survey, including test exca-
vations, and assessment of significance performed by a
professional archaeologist would be necessary in order to
ascertain the extent and potential significance of these cul-
tural materials.

"Given the ground-disturbing nature of the proposed
surface mining operation and the presence of cultural mate-
rials, it is not possible to conclude that the proposed use
would not adversely affect cultural resources until a com-
plete cultural resource survey is conducted."

Based on the above finding, the commission issued an order
denying the quarry application.[4] We later affirmed the
commission's order. *Murray v. Columbia River Gorge
Commission*, 125 Or App 444, 447, 865 P2d 1319 (1993).

A few days after Murray became aware of the com-
mission's denial of his application, he conducted surface min-
ing and quarry operations on his property. Following that
action, the commission sought a temporary restraining order
and a preliminary injunction from the Wasco County Circuit
Court to stop the mining activity. The Confederated Tribes of
the Warm Springs Reservation intervened in the case. The
trial court issued a preliminary injunction. After the issuance
of the injunction, Murray used a tractor with ripper blades on
a portion of the property where it was believed that cultural
resources were present. Murray also sent a letter to the trial
court advising the trial court, "I will not pay any attention to
any directive, statement, judgment or order regarding me
mining on my property[.]"

The trial court eventually entered a permanent
injunction prohibiting Murray from engaging in any activi-
ties that required a permit, except for the previously
approved barn, until he obtained a permit for the activity.
The trial court explained that the injunction was issued
because Murray's actions were for the purpose of destroying
cultural resources on his property. The trial court stated:

"Were this solely a case of economic hardship burdening
a well-intended landowner, the equities might tip away

---

[4] All of the above-mentioned applications of the Murrays were submitted when
the Final Interim Guidelines were in effect.

from the Commission. However, Mr. Murray's actions in this case indicate that he is not motivated primarily to lawfully husband his land but rather to 'impress' the press and his constituency with brazen acts of bravado and vandalism. Knowing that these artifacts from past cultures are forever lost once damaged or destroyed, Murray's acts of deliberate destruction of Native American artifacts, even in the cause of protesting the Act, amount[ ] to cultural terrorism pure and simple."

Murray was also ordered by the trial court to allow representatives of the commission and the tribe to enter his property with 48 hours' prior written notice for the purpose of conducting a cultural resources inventory. The trial court directed the commission to prepare a restoration plan within 30 days that included a description of the location and types of cultural resources on the property and a plan for restoring the site, as well as the costs of implementing the plan. Murray was allowed to file objections to the plan, after which the trial court would enter a judgment.

The cultural resources survey required by the trial court was completed in June 1994. The survey team found significant materials that showed that prehistoric tool manufacturing had occurred on the property. They also found two possible cairns that were typical of Native American burial or vision quest sites. The team concluded that Murray's ground-disturbing activities and use of heavy equipment had caused damage to some archaeological deposits and displaced some artifacts, although it was determined that significant artifacts still remained in the excavated areas. It was the opinion of the survey team that the archaeological resources that Murray had destroyed could not be restored. The team recommended that no further ground-disturbing activities be allowed on the property. Based on those findings, the commission concluded that Murray had willfully violated the Act and issued an order to that effect. The commission's order was later affirmed by this court. *Murray v. Columbia River Gorge Commission*, 133 Or App 461, 466, 891 P2d 1380 (1995).

A final judgment was entered in October 1994, approving the cultural resources survey and restoration plan. The judgment provided, in part:

> "All ground-disturbing or earth-moving activities shall be prohibited within the archaeological site shown on Figure 11 of the cultural resources survey and land restoration plan, except for the two filled areas shown on Figure 11. Minor ground-disturbing and earth-moving activities in the two filled areas may be allowed if the steep slopes on the edges of the filled areas are not disturbed or destabilized. *All ground-disturbing and earth-moving activities, new development, and new land uses on the filled areas, as well as the entire property, shall be consistent with this judgment and the <u>Management Plan for the Columbia River Gorge National Scenic Area</u> and any land use[ ] ordinances that implement it.*"

(Emphasis added; underscoring in original.)

Murray was required to allow monitoring of the site with reasonable notice. He was also directed to record the site with the State Historic Preservation Office. The trial court assessed the $7,000 cost of the cultural resources survey against Murray. Murray appealed that final judgment to this court. However, he eventually voluntarily dismissed the appeal.

In February 1997, plaintiffs initiated the present action against the State of Oregon.[5] The first count of the operative complaint relied on ORS 358.953(1). The series of statutes of which ORS 358.953(1) is a part, ORS 358.905 to 358.961, generally sets out requirements for protection of and prohibits certain conduct related to archeological objects and sites, whether on public or private land. Under ORS 358.953(1), landowners may be entitled to compensation from the state if they are deprived of an otherwise lawful use of their land because of the location of archeological sites or objects on the owner's property. In the first count of their first amended complaint, plaintiffs sought a writ of mandamus requiring the state to initiate condemnation proceedings under ORS 358.953(1). The second and third counts sought a judgment of inverse condemnation under Article I, section 18, of the Oregon Constitution and the Fifth Amendment to

---

[5] Both the commission and Friends ultimately requested and were granted permission to intervene.

the United States Constitution. In the first inverse condemnation count, plaintiffs alleged that, because of the October 1994 judgment, they were unable to make an economically viable use of their land. In the second inverse condemnation count, plaintiffs alleged that the state had physically occupied their land by entering the October 1994 judgment.

The following pretrial and trial motions and rulings are pertinent to our resolution of this appeal: The state sought and was granted dismissal of plaintiffs' claim seeking inverse condemnation under a physical occupation theory and their claim seeking a writ of mandamus directing the state to institute condemnation proceedings under ORS 358.953(1). The state sought and was denied summary judgment on the basis that plaintiffs' takings claims were not ripe. Plaintiffs moved for summary judgment as well, asking that the court hold, among other things, that the October 1994 judgment effected a taking and requesting that the court hear evidence on the issue of damages. As is discussed below, the trial court granted that motion in part.

Trial was set for January 23, 2001. Before hearing any testimony, the trial court held that the commission was a state agency and that the October 1994 judgment against plaintiffs was a taking. In so holding, the trial court granted part of plaintiffs' motion for summary judgment. The court explained, "[I]t's the judgment that has caused me to say that there is a taking, but it's a result of the lawsuit that was brought by the Gorge Commission." It further stated, "Courts do not take. The court is only acting in response to the action that was brought by the Gorge Commission; and that's the basis of the court's decision." Following the receipt of testimony that focused on the permissible uses of the property and its value, the court again held that a regulatory taking had occurred and that the commission was an agency of the state. The court also held that plaintiffs had been deprived of all economically viable use of the property. At the close of the trial, Friends orally moved to dismiss plaintiffs' inverse condemnation claims on the ground that they were not ripe. The trial court requested that Friends file a written motion to dismiss on that basis, which Friends, together with the commission, did. The trial court did not expressly rule on that motion. Ultimately, the court entered judgment in plaintiffs'

favor on their first inverse condemnation claim, awarding damages of $222,000.

■        As noted, the trial court dismissed plaintiffs' claim seeking a writ of mandamus and their second inverse condemnation claim, which was based on a physical occupation theory. The dismissal of the mandamus claim is not challenged on appeal. Plaintiffs cross-assign error to the trial court's dismissal of their claim for inverse condemnation resulting from the physical occupation of their property. However, as we will explain, a cross-assignment of error, as opposed to a cross-appeal, is not sufficient to raise that argument under the circumstances here. ORAP 5.57(2) provides that a cross-assignment of error is appropriate

> "(a)    [i]f, by challenging the trial court ruling, the respondent does not seek to reverse or modify the judgment on appeal; and

> "(b)    [i]f the relief sought by the appellant were to be granted, respondent would desire reversal or modification of an intermediate ruling of the trial court."

We have explained that a cross-appeal is not necessary where a respondent raises an alternative ground on which the judgment may be upheld, where reversal or modification of the judgment is not sought, or where reversal of an intermediate ruling of the trial court is sought if the case is remanded. *Samuel v. King*, 186 Or App 684, 690, 64 P3d 1206, *rev den*, 335 Or 443 (2003). Here, plaintiffs do not come within the circumstances in which a cross-assignment is sufficient to raise an issue on appeal. The trial court entered judgment on plaintiffs' separate claim for inverse condemnation based on a physical occupation theory. In the arguments that plaintiffs characterize as a cross-assignment, plaintiffs are seeking more than affirmance of the trial court judgment on a different theory. Rather, they are seeking modification and reversal of that part of the judgment dismissing plaintiffs' separate claim for inverse condemnation. A cross-appeal is required under those circumstances. *Ricciardi v. Frink*, 133 Or App 436, 447, 891 P2d 1336, *rev den*, 321 Or 268 (1995). Accordingly, the cross-assignment is not a proper means of challenging that portion of the judgment and we do not address it.

■     The state, Friends, and the commission appeal the judgment, challenging it on a variety of bases. Because it is dispositive, we begin by addressing their argument that plaintiffs' remaining inverse condemnation claim was not ripe.[6]

■■     Plaintiffs argued to the trial court that defendant's regulatory action effectively took their property for public use without compensation. Government action can constitute a taking if it goes too far. As the Supreme Court explained in *Pennsylvania Coal Co. v. Mahon*, 260 US 393, 415, 43 S Ct 158, 67 L Ed 322 (1922), "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Under both state and federal law, a taking will be said to occur when landowners have been deprived of "all substantial beneficial or economically viable use of" their property. *Homebuilders Assn. v. Tualatin Hills Park & Rec.*, 185 Or App 729, 734, 62 P3d 404 (2003) (internal quotation marks omitted). Similarly, under the federal constitution, a taking occurs when a regulation "denies all economically beneficial or productive use of land." *Palazzolo v. Rhode Island*, 533 US 606, 617, 121 S Ct 2448, 150 L Ed 2d 592 (2001) (internal quotation marks omitted).

Before it can be determined, however, if government regulations have gone so far as to constitute a taking, there must be a final decision from the government regulatory body regarding the application of the regulations to the property at issue. *Boise Cascade Corp. v. Board of Forestry*, 164 Or App 114, 129, 991 P2d 563 (1999), *rev den*, 331 Or 244 (2000), *cert den*, 532 US 923 (2001). As we explained in *Nelson v. City of Lake Oswego*, 126 Or App 416, 421, 869 P2d 350 (1994) (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 US 340, 348, 106 S Ct 2561, 91 L Ed 2d 285 (1986)), it follows from the nature of a regulatory claim that an authoritative

---

[6] Plaintiffs argue that, because the trial court did not formally deny the motion of Friends and the commission to dismiss the inverse condemnation claims based on a lack of ripeness, this issue was not preserved for appeal. It is undisputed, however, that the motion was before the trial court and considered by the trial court. Although the final judgment did not expressly deny the motion, it is evident from the trial court's award in favor of plaintiffs on their inverse condemnation claim that the trial court implicitly denied the motion. *See State v. Melton*, 189 Or App 411, 76 P3d 156 (2003) (appeal from an order revoking probation in which assignment of error is the trial court's failure to grant a motion to dismiss).

determination of how the regulation applies to the property is an " 'essential prerequisite' " to asserting a takings claim in court. If there are available administrative procedures through which landowners may seek to modify the effects of regulations on the use of their property and those procedures provide a possibility that development could occur on the property, the landowners must pursue those administrative procedures before a takings claim may be considered "ripe." *See Suess Builders v. City of Beaverton*, 294 Or 254, 656 P2d 306 (1982) (property has not been taken where possibility of relief from regulatory restriction remains available); *Boise Cascade Corp. v. Board of Forestry*, 186 Or App 291, 303, 63 P3d 598, *rev den*, 335 Or 578, *cert den*, 540 US 1075 (2003) (same); *L.A. Development v. City of Sherwood,* 159 Or App 125, 977 P2d 392, *rev den*, 329 Or 61 (1999), *cert den*, 528 US 1075 (2000) (same).

As we have held in earlier decisions, the ripeness requirement must be satisfied before a regulatory takings claim can become judicially cognizable. *Larson v. Multnomah County*, 121 Or App 119, 123-24, 854 P2d 476, *adh'd to on recons*, 123 Or App 300, 859 P2d 574 (1993); *accord Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 US 302, 339, 122 S Ct 1465, 152 L Ed 2d 517 (2002) (Fifth Amendment imposes "strict ripeness requirement" that protects the public interest in informed decision-making by requiring landowners to take reasonable and necessary steps to give regulatory agencies the opportunity to exercise full discretion to determine what uses are allowable before a landowner may bring a takings claim). That requirement is not a mere legal technicality. Until a final determination of all permissible uses of the property is made by the proper regulatory entity, there remains the possibility for " 'a mutually acceptable solution' " that could obviate the need for a taking. *Nelson*, 126 Or App at 425 (quoting *Hodel v. Virginia Surface Mining & Recl. Assn.*, 452 US 264, 297, 101 S Ct 2352, 69 L Ed 2d 1 (1981)). Until a landowner has exhausted those other possible resolutions with the administrative body, it is improper for a court to entertain a regulatory takings claim. *L.A. Development,* 159 Or App at 129; *Curran v. ODOT*, 151 Or App 781, 787, 951 P2d 183 (1997); *Nelson,* 126 Or App at 424.

Here, plaintiffs do not dispute that they did not complete the regulatory process and pursue all available administrative remedies to obtain approval of the development activities that they wished to undertake on their property. They were told numerous times that it would be necessary to complete a cultural resources survey in order to proceed with the application process. They refused to do so. Further, they did not seek review of the commission's decision denying their application to conduct mining activities on their property. Because plaintiffs did not pursue all available administrative remedies, there remained a possibility that a solution allowing some development activities on all or part of their property might be obtained. Accordingly, plaintiffs' inverse condemnation claim was not ripe for judicial review.[7]

It is the position of plaintiffs and was the holding of the trial court that, despite plaintiffs' failure to follow through with the application process, the issuance of the injunction by the trial court in 1994 essentially caused the issue to become ripe for judicial review. The trial court in this case concluded that plaintiffs "lost all economically viable use of the property described in attached Exhibit A by virtue of the entry of final judgment on October 24th, 1994 in Wasco County Circuit Court * * *."

As we will explain, however, the issuance of the injunction did not cause plaintiffs' inverse condemnation claim to become ripe. The issuance of the injunction became necessary because plaintiffs ignored the proper administrative process for obtaining approval of development activities

---

[7] Friends joins in the arguments of the state regarding ripeness but makes an additional argument on the issue. Friends contends that, at the time that plaintiffs brought this case, the Wasco County Planning Department had implemented the Gorge Commission Management Plan through its land use ordinances. The ordinances apparently differ in material respects from the Final Interim Guidelines. Friends argues that, because plaintiffs failed to submit any applications seeking permission to develop their property under the county's ordinances, the claim is not ripe for review. In view of our holding that ripeness was not established because of plaintiffs' failure to complete the applicable administrative process of the commission at the time of their application, it is unnecessary to address the question of whether plaintiffs were required to exhaust remedies that became available after they abandoned the application process and the permanent injunction was issued and, if so, if they failed to exhaust those remedies.

on their property. Rather than cooperate with the commission in completing a cultural resources survey and restoration plan that might have resulted in approval of some or all of their proposed activities on all or part of their property, plaintiffs completely disregarded the commission's order and correspondence and conducted mining activities on their property without a permit in violation of the Act and the commission's regulations. It was those unlawful activities that made it necessary for the commission to seek an injunction preventing further unlawful actions by the plaintiffs. The injunction issued in response to those unlawful activities was not a final determination by a regulatory agency delineating the lawful uses that plaintiffs could conduct on their property. Plaintiffs' actions prevented the regulatory agency from making such a decision. Ignoring an administrative regulatory body and taking actions completely contrary to the regulations and orders of that body has never been a proper alternative means of creating a final determination in order to make a matter ripe for judicial review, nor should it be now.

The trial court also held, and plaintiffs argue here, that even if it is determined that their inverse condemnation claim was not ripe, they did not need to wait until their claim was ripe because it would have been futile to do so. The trial court agreed with that argument, reasoning that it would have been futile for plaintiffs to have continued in the administrative process or to have submitted further applications to the commission after the injunction was issued.

■■    Futility excuses a landowner from taking steps to ripen a claim when it is shown that there is no possibility that a viable proposal of any kind will be approved. *Larson*, 123 Or App at 303. The plaintiff asserting a takings claim, however, has the burden to demonstrate futility. *Boise Cascade Corp.*, 186 Or App at 300. Such a plaintiff must prove that "there was very little likelihood—or no likelihood—that the development would have been approved" if the plaintiff had taken further steps to obtain approval of a proposal. *Id.* at 303.

Plaintiffs here failed to satisfy their burden to demonstrate futility. In fact, there is evidence in the record demonstrating a possibility that, if plaintiffs had taken further

steps, the development might have been approved. The evidence shows that, throughout the various application processes that plaintiffs undertook, the commission exhibited a willingness to work with them in reaching a resolution that might allow some development of their property. With respect to the April 1993 application seeking approval of mining activities on the property, the commission continued to express a willingness to work with plaintiffs. The director's letter of June 17, 1993, indicated the commission's willingness to work with plaintiffs to complete the cultural survey and develop a mitigation plan to avoid the adverse effects of the proposed activities on cultural resources and presumably allow the approval of some activities. Further, there was evidence that some of the property could be used for other activities such as grazing and possibly could meet the criteria for a nonfarm dwelling.

Plaintiffs do not view as particularly pertinent the evidence regarding what might have happened if they had continued with the administrative process. They do not dispute that they did not continue with or complete the administrative process available before the commission. As discussed above, they essentially took the matter into their own hands and acted in violation of the commission's rules and orders. They argue, however, that, despite their actions, the issuance of the injunction in 1994 forever barred them from engaging in any development activities on their property and, consequently, made any further efforts through the administrative process futile. In making that argument, they rely on the language of the final judgment in the injunction case. Specifically, they rely on the language quoted above from the judgment that provides, "All ground-disturbing or earth-moving activities shall be prohibited within the archaeological site shown on Figure 11 of the cultural resources survey and land restoration plan[.]" Plaintiffs understand the language of the judgment to permanently bar any such activities on the property.

We do not agree with plaintiffs' reading of the language of the judgment. First, the limitations imposed by the judgment apply only to the "archaeological site," which covers only a portion of plaintiffs' property. Consequently, it is possible that some use could be made of other parts of the

property. In addition, following the language that they rely on, the final judgment provides, "All ground-disturbing and earth-moving activities, new development, and new land uses on the filled areas, *as well as the entire property,* shall be consistent with this judgment and the <u>Management Plan for the Columbia River Gorge National Scenic Area</u> and any land use[ ] ordinances that implement it." (Emphasis added; underscoring in original.) That language clearly contemplates that such activities may be permissible on any part of "the entire property" if plaintiffs comply with the applicable standards. Nothing in the language of the final judgment indicates that the prohibition mentioned in the language upon which plaintiffs rely is permanent or that plaintiffs are precluded from seeking approval for such activities if they can be conducted in a manner that is consistent with the applicable regulations and standards of the commission and local government.

Accordingly, because we conclude that plaintiffs did not prove that their completion of the administrative process would be futile or that the language of the final judgment in the injunction case forever precluded them from seeking approval of any development activities, we hold that plaintiffs did not meet their burden of proving futility. The trial court erred as a matter of law in concluding that futility excused plaintiffs from establishing that their claim was ripe for judicial review. In sum, we conclude that plaintiffs' claim for inverse condemnation was not ripe for judicial review and the trial court erred in not granting the motion to dismiss the claim. In view of our holding, it is not necessary to address the state's remaining assignments of error.

Judgment vacated; remanded with instructions to dismiss.